Original Court

FILED
JAN -2 2019
SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| 1 | Your Name: | Perfecto Bauer Garcia |
| 2 | Address: | 325 Merganser Dr, P.O. BOX 2774- |
| 3 | Phone Number: | Suisun City, CA. 94585-999-8 |
| 4 | Fax Number: | 707 280 4047 |
| 5 | E-mail Address: | pbg1959@outlook.com |
| 6 | Pro Se Plaintiff | |

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CV - 19   0003

Perfecto Bauer Garcia

Case Number  *[leave blank]*

Plaintiff,

vs.

Mark Boessenecker

Gary A. Van Camp

Michael L. Moore

And Does 1 to 40

Defendant.

**COMPLAINT**

EDL

DEMAND FOR JURY TRIAL

Yes ☐  No ✔

**PARTIES**

1.  Plaintiff.  [*Write your name, address, and phone number. Add a page for additional plaintiffs.*]

| | |
|---|---|
| Name: | Perfecto Bauer Garcia |
| Address: | 325 Merganser Dr., P.O. BOX 2774 Suisun, City, CA. 94585-999-8 |
| Telephone: | Cell 707 280 4047 |

COMPLAINT
PAGE  1  OF  8  [*JDC TEMPLATE – Rev. 05/2017*]

2. Defendants. [*Write each defendant's full name, address, and phone number.*]

Defendant 1:

Name: Mark Boessenecker

Address: 4124 Foxridge Way Napa, CA. 94558

Telephone: 707 256 3670

Defendant 2:

Name: Gary A. Van Camp

Address: 931 Parkway Mall Napa, CA. 94559

Telephone:

Defendant 3:

Name: Michael L. Moore

Address: Napa Police Department, 1539, 1st Street, Napa, CA. 94559

Telephone: 707 257 9223

## JURISDICTION

[*Usually only two types of cases can be filed in federal court, cases involving "federal questions" and cases involving "diversity of citizenship." Check at least one box.*]

3. My case belongs in federal court

☑ under <u>federal question jurisdiction</u> because it is involves a federal law or right.

[*Which federal law or right is involved?*] Civil Rights

_____.

☐ under <u>diversity jurisdiction</u> because none of the plaintiffs live in the same state as any of the defendants <u>and</u> the amount of damages is more than $75,000.

COMPLAINT
PAGE 2 OF 8 [*JDC TEMPLATE – Rev. 05/2017*]

**VENUE**

*[The counties in this District are: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa, San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo, or Sonoma. If one of the venue options below applies to your case, this District Court is the correct place to file your lawsuit. Check the box for each venue option that applies.]*

    4.    Venue is appropriate in this Court because:

☐ a substantial part of the events I am suing about happened in this district.

☐ a substantial part of the property I am suing about is located in this district.

☑ I am suing the U.S. government, federal agency, or federal official in his or her official capacity <u>and</u> I live in this district.

☐ at least one defendant is located in this District and any other defendants are located in California.

**INTRADISTRICT ASSIGNMENT**

*[This District has three divisions: (1) San Francisco/Oakland (2) San Jose; and (3) Eureka. First write in the county in which the events you are suing about happened, and then match it to the correct division. The San Francisco/Oakland division covers Alameda, Contra Costa, Marin, Napa, San Francisco, San Mateo, and Sonoma counties. The San Jose division covers Monterey, San Benito, Santa Clara, Santa Cruz counties. The Eureka division covers Del Norte, Humboldt, Lake, Mendocino counties, only if all parties consent to a magistrate judge.]*

    5.    Because this lawsuit arose in ___Napa___ County, it should be assigned to the ___San Francisco, CA.___ Division of this Court.

**STATEMENT OF FACTS**

*[Write a short and simple description of the facts of your case. Include basic details such as <u>where</u> the events happened, <u>when</u> things happened and <u>who</u> was involved. Put each fact into a separate, numbered paragraph, starting with paragraph number 6. Use more pages as needed.]*

    6.  Fact one is a certified Reporters transcript of proceedings Napa County, dated May 30, 2018. I, was sentence to 30 day's in jail for probation violation, even though-

Honorable Mark Boessenecker was awere of my medical condiction. They took away my-

Morphine that helps me sleep at night and I have severe sleep apena, and stage three-

kidney dieases. I check in jail on June 27, 2018, and I did not sleep at all, I had a fall-

COMPLAINT
PAGE 3 OF 8 *[JDC TEMPLATE – Rev. 05/2017]*

7.   On July 3, 2018, and landed on my tail bone and my neck was pinched up-against the wall. I am in a lot of pain I had asked the Male Nurse if I can get checked-over by a doctor at the Hostipal? And he said no you have to finshed your time in jail. I was released on July 5, 2018, and my friend said my words were slurs and she took-me to the ER Hospital in Fairfield, CA. The Doctor found out I was Dehydration and they-

8.   had to hook up an IV in my vain for fluids and force me to drink lots of water-and the doctor also said he found a kidney injury. The Doctor sugested that I get MRI -done to my neck and I found out I have two herniated disc and a torn muscle. the pain is severe and I am going to see a specialist for neck surgery. I will attached-eight pages of my Doctor report and ER Doctor reports.

9   Fact: I, was sentence in jail September 2017 and December 2017 in jail -both time I was denied my sleep apena Machine I, could have died! Civil Rights Violation! I, have a audio of Darrel Hanson's voice theatening my life and I asked officer Michael-L. Moore that I want to press charges on Mr. Hanson, for using a deadly weapon and-threatening my life! And they did nothing!

10.   Gary A. Van Camp, left out a lot of evidence for the Jury of Mr. Hanson, being -violant person towards the Garcia family for many years! Napa Police Report 02-6711-Assult with a Deadly Weapon, victim Rudolph Ovalle Garcia, I was a wittness, Mr. Hanson-trying to run over my father with his car!  Napa Police Officer Andrew Hess took the -report and said no evidence! "NAPA POLICE CORUPTION"! Their was a video and audio.

11.   On December 04, 2002, time 20:45:30 YouTube audio and video Mr. Hanson-comes over my fathers house at 563 Monroe Street, Napa, CA. And he is threatening my -father Rudolph Ovalle Garcia, saying "YOU KNOW TO MUCH YOU WILL BE SIX FEET-UNDER SOON"! And he also said go "BACK TO MEXICO"!

//

//

COMPLAINT
PAGE 4 OF 8 [JDC TEMPLATE – Rev. 05/2017]

# CLAIMS

## First Claim

Civil Rights Violation

*(Name the law or right violated*: _____ )

*(Name the defendants who violated it*: Napa County Judge Mark Boessenecker, & _____ )

[*Explain briefly here what the law is, what each defendant did to violate it, and how you were harmed.  You do not need to make legal arguments.  You can refer back to your statement of facts.*]

12.    Defendants: District Attorney Gary A. Van Camp, Defendant Napa Police Officer Andrew Hess, Napa Police Officer Michael Moore and Does 1 to 40. Mr. Mark Boessenecker, stated on a court appeal transcript page 1413 line 14 And as I told counsel at the start of this trial, I was familiar with this sort of nieghborhood dispute going back

13.    a number of years because of restraining order violation cases that have been submitted, things of that nature. See Exhibit A  Reporter's Transcript On Appeal Napa, CA., Tuesday, October 25, 2017, 8:30 a.m. page 1413 line 14.`Mr. Boessenecker discrimniated against me and my father Rudolph Ovalle Garcia on several Police reports or

14.    Darrel Joseph Hanson! On May 30, 2018. Napa court Transcript, violation of probation. The District Attorney and the probation department and the public defender thought I should do anger management versus jail time due to my health condition. But the allged victim had told the Judge Boessenecker a bunch of lies and the Judge agrees

15.    with him that I have been harassing him for over tweenty years he is a liar and so is the Judge they are both trying very hard to kill me in jail! They tried two times in September of 2017 and December both time I did not have my sleep apena machine I could of died! I filed a Napa Police report and turned it in on May 22 2017 at the front desk

16.    the report was about Darrel Hanson treatening my life with his voice and a - the use of a deadly weapon and a Hate Crime. And the Police did nothing for me did not even contact me! Deputy District Attorney Gary A. Van Camp, was in my neighborhood arresting one of my neighbors, Mark Edwards Ingalls, he was giving away marijuana!

//

COMPLAINT
PAGE 5 OF 8 *[JDC TEMPLATE – 05/17]*

563 Monroe St. Napa, **Claim**

*(Name the law or right violated:* Civil Rights )

*(Name the defendants who violated it:* Deputy Chief Building Offical Keith Marks )

17.  On August 24, 2014, around 3:24 a.m. Napa Ca. earthquake demaged my-foundation. On December 23, 2014, Napa Building inspector came out to look at our-foundation forms and signed the permit and said it looks good and left with a smile. I, had-the concrete poured in the foundation by next week and lowered the house on the walls.

18.  I, recieved a letter from Napa Code Enforcement stated that my foundation -will not support a two story house and I told him he the building inspector signed the -permit to pour the concrete! Now I am not only a victim from the earthquake I am also-a victim from the City of Napa for Damaging my home at 563 Monroe Street, Napa, CA.

19.  I, cannot buy home owners insurance because my house is unsafe thanks-to the City of Napa using a temporary Building inspector from out of town and my house-is left unfinesh! My Father Rudolph Ovalle Garcia, is 80 years old with no heather or-hot water since the earthquake in 2014! I, will attached an email from Mr. Keith Marks-

20.  also a copy of the permit of the foundation being approved. And I am going to-attached police reports of Darrel Joseph Hanson, violating restraining orders and he -has corrupted police officers, District Attorney's and a Judge Mark Boessenecker! This is-why Mr. Hanson is above the law and he is free to continue his harassments and Judge-

21.  Mark Boessenecker, made sure of that I, would not use and video are audio-recording device to protect my self and record Mr. Hanson's harassments! He took away-my Civil Rights to record outside in Public Street! I did a lot of research on YouTube-of pedestrian getting hit buy cars and all of them go in the opposite direction that Darrel-

22.  Hanson testified under oath on several Transcripts proven he is a liar! -Deputy District Attorney Gary A Van Camp, is a liar, Napa Police Officer Michael Moore-is a liar, and Napa Police Officer Andrew Hess Badge #116. Mr. Hanson should go to -prison for lying! DEMAND FOR RELIFF FROM DEFENDANTS: 40 Million Dollars.

# DEMAND FOR RELIEF

*[State what you want the Court to do. Depending on your claims, you may ask the Court to award you money or order the defendant to do something or stop doing something. If you are asking for money, you can say how much you are asking for and why you should get that amount, or describe the different kinds of harm caused by the defendant.]*

21.    I, Perfecto Bauer Garcia, is asking the Court for punitive damages from the

Defendants for all my injuries on my whole body and pain and suffering that I am induring

for the rest of my life! I, have a house with no home owner insurance becuase the City of-

Napa Damaging my foundation at my home at 563 Monroe Street, Napa, CA. 94559.

My Father has been sufering without no heather and no hot water and I believe that-

some people have a personal vandetta because of the Lenore Stearns case that my-

Father Rudolph Ovalle Garcia, was cheated out of his inheritance from local law officals!-

And the City of Napa are trying to force my father of his own property knowing he is-

going to be 81 years old in February 6, 2019, and he cannot get any home owners -

insurance to refinance and to finshed his house! I believe this is Civil Rights Violation!

# DEMAND FOR JURY TRIAL

*[Check this box if you want your case to be decided by a jury, instead of a judge, if allowed.]*

☐    Plaintiff demands a jury trial on all issues.

Respectfully submitted,

Date: 12/31/2018        Sign Name: *Perfecto Bauer Garcia*

Print Name:    Perfecto Bauer Garcia

COMPLAINT
PAGE 7 OF 8 *[JDC TEMPLATE – 05/17]*

*[Copy this page and insert it where you need additional space.]*

22. Rudolph Garcia v Darrel Hanson Transcript No. 26-21550 June 19, 2003 page 18 Darrel Hanson stated he is going to move out three months! EXHIBIT B Napa Police Report 02-6711 4 pages my statement and my fathers, and there is a- YouTube video and audio search Darrel Hanson napa ca july 4 2002, also Napa Police- officer Andrew Hess, july 4, 2002. EXHIBIT C. Keith Marks email EXHIBIT D. Inspector Craig Bogen, EXHIBIT E.  Napa Police Report 04-6220 EXHIBIT F.

23. YouTube video and audio of Darrel Hanson Threatening my life on the - internet just click on the speaker. EXHIBIT G.  YouTube video and audio Darrel Hanson- 02/11/2003 is harassing my father Rudolph Ovalle Garcia, comes over to my fathers- property and says that he has been in my fathers house and stold his mail and he is just- harassing! EXHIBIT H. YouTube video and audio April 18, 2005, false Police report- written by Darrel J. Hanson, and Napa Police Officer Frank Esser! EXHIBIT I.

24. YouTube video and audio Darrel Hanson comes over to my fathers house- and threatens his life on 12/04/02, and he comes over on 12/ 06/02 and yells at my - mother and father and accuse them of stealing his gril friend's wallet out of her car!- video length 39:09 minutes. EXHIBIT J.

EXHIBIT K  The People of the State of California vs. Perfecto Garcia, CR183040- Date May 30, 2018, Napa Court Transcript. EXHIBIT L. ER Doctor report July 5, 2018-

25. 11 pages. EXHIBIT M. The Plaintiff Leroy Paul Eldridge, Napa Police- Department, Napa Sheriff's Department, Napa District Attorney's Department and the- Eldridge's conspired to altar Honorable Judge McKibben's, granted a "MUTUAL" Restraint Order After Hearing on December 14, 1993, Defendant Rudolph Ovalle Garcia and the- Eldridge family are to stay away from each other 25 yards! The case number is 67795- at the time of the order the Eldridge's house was vacant and their house is directly across-

26. the Street from my father's house 563 Monroe Street, Napa, CA.
EXHIBIT N. Darrel J Hanson, Richard P. Eldridge, Sarah M Curtis, Rhonda Eldridge,- used this court Transcript No. 26-32739 3/7/06 to set me up on November 9, 2016.

COMPLAINT
PAGE 8 OF 8 *[JDC TEMPLATE – 05/17]*

EXHIBIT A

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

IN AND FOR THE FIRST APPELLATE DISTRICT

--oOo--

THE PEOPLE OF THE STATE OF CALIFORNIA,  )
)
     Plaintiff/Respondent,  )
)
vs.  )  No.  A152783
)
PERFECTO GARCIA,  )
)
     Defendant/Appellant.  )
)
_____)

COPY

--oOo--

**REPORTER'S TRANSCRIPT ON APPEAL**

--oOo--

Reporter's Transcript of Proceedings Had

AT TIME OF SENTENCING

--oOo--

Napa, California
Tuesday, October 25, 2017
8:30 O'Clock A.M.

**Volume 13**
**(Pages 1401 - 1418)**

Reported by:
Michelle Corrigan, CSR, RPR-RMR, CRR
CSR No. 9079

--oOo--

1402

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF NAPA

THE HONORABLE MARK S. BOESSENECKER, JUDGE

--oOo--

THE PEOPLE OF THE STATE OF CALIFORNIA, )
                                   )
         Plaintiff,       )
                                   )
vs.                           )   No.  CR183040
                                   )
PERFECTO GARCIA,               )
                                   )
         Defendant.      )
                                   )
_____)

--oOo--

REPORTER'S TRANSCRIPT OF PROCEEDINGS HAD

AT TIME OF SENTENCING

--oOo--

Napa, California
Tuesday, October 25, 2017
8:30 O'Clock A.M.

--oOo--

Reported by:
MICHELLE CORRIGAN, CSR, RPR-RMR, CRR
CSR No. 9079

1    <u>Tuesday, October 25, 2017</u>          <u>8:30 O'Clock A.M.</u>

2                          --oOo--

3          The above-entitled cause came regularly this day

4    for hearing before the Honorable MARK S. BOESSENECKER,

5    Judge.

6          ALLISON HALEY, District Attorney, County of Napa,

7    931 Parkway Plaza, Napa, California 94559, represented by

8    GARY VAN CAMP, Deputy District Attorney, appeared as

9    counsel on behalf of the People.

10          RONALD ABERNETHY, Public Defender, County of

11    Napa, 1127 First Street, Napa, California 94559,

12    represented by ANDREW HIGGINS, Deputy Public Defender,

13    appeared as counsel on behalf of the Defendant.

14          MICHELLE CORRIGAN, CSR No. 9079, 1111 Third

15    Street, Room 328, Napa, California 94559, (707) 299-1187,

16    was duly present and acting as an Official Shorthand

17    Reporter for the County of Napa.

18          The following proceedings were then and there

19    had, to wit:

20                P R O C E E D I N G S

21          THE COURT:  So the first matter on our criminal

22    calendar is People versus Perfecto Garcia.  Appearances,

23    please.

24          MR. VAN CAMP:  Gary Van Camp for the People.

25          MR. HIGGINS:  Andrew Higgins with Mr. Garcia.

26    He's present.  He's out of custody, your Honor.

27          THE COURT:  All right.  So the matter is on for

28    sentencing.  This is a matter that was tried in front of a

1    jury.  The defendant was convicted of a violation of Penal

2    Code Section 245(a)(1), a felony.  I have read and

3    considered the probation officer's report and

4    recommendation.  I've also read the letters submitted on

5    behalf of Mr. Garcia, which I'm going to direct that they

6    be made part of the court file in this matter.

7              Is formal arraignment for judgment waived and is

8    there no legal cause?

9              MR. HIGGINS:  Yes.

10             THE COURT:  Mr. Van Camp, your comments with

11   regard to the recommendation.

12             MR. VAN CAMP:  Well, your Honor, I was -- I found

13   the report to be interesting to the point of, that the --

14   for the first time that I know about, the defendant

15   admitted that he did this crime, or at least that he

16   admitted driving at the victim.  And he's got an excuse

17   that he slipped -- something slipped when he was startled

18   in the driveway and that kind of thing, but I find it --

19   and then you've got these letters from these people saying

20   what a good person he is, and of course that's the kind of

21   letters they're going to submit in something like this, and

22   that he's a good church-going member and things like that,

23   which are to his credit.  But on the other hand, none of

24   these people know about or refer to this offense.

25             And this neighbor dispute, this -- and frankly, I

26   found that he could have killed this guy, this victim, or

27   he could have seriously hurt him.  And that's why it's a

28   serious offense.

1    And it's interesting to me that when he's first
2  contacted by the police, or when he contacts the police
3  after fleeing the scene, he told Michael Moore, who's
4  sitting here with me from the police department, that he
5  never drove forward towards the victim.  That when he
6  pulled into the driveway, he put the car in reverse, backed
7  out and drove off to Fairfield.  And then he later submits
8  an e-mail explanation of what supposedly happened where he
9  says he drove into the driveway, he started to -- "The
10  victim started to run at me very fast, he reached for his
11  hose and he squirted my windshield."  And I'm using the
12  word "squirted" because that's what the defendant used in
13  his e-mail to the police, and there was quite a bit of talk
14  at the trial about squirting and whether that was a squirt
15  or a blast.
16    The defendant said he was scared.  He heard him
17  say, "You're dead," and then he put the car in reverse and
18  took off to the Fairfield Police Department.  And then, of
19  course, to the Probation he comes up with a different story
20  and says that he didn't -- didn't intentionally try and hit
21  him but was scared and approached and accidentally
22  accelerated and went forward.  So he -- now we know, at
23  least partially, that the defendant admits to accelerating
24  and hitting the victim and that this was an intentional
25  act.  Whether he wants to admit it or not, the jury found
26  it to be an intentional act and it's a very dangerous act
27  that could have seriously injured or hurt or even killed
28  Mr. Hanson, who's here today and has decided not to say

1   anything further other than the information that he's

2   provided to the probation officer.

3           So I don't think that the recommendation of a

4   hundred twenty days is appropriate.  I certainly feel that

5   -- I could sit here and justifiably argue for prison on an

6   act like this.  This was an assault with a deadly weapon

7   and this deadly weapon certainly could have killed or

8   seriously injured Mr. Hanson, as I've mentioned.  But

9   luckily for Mr. Hanson's sake, and perhaps for the

10  defendant's sake, he wasn't seriously hurt.  He was

11  injured, but not seriously, and I -- as I argued to the

12  jury, and I think his athletic ability, the victims's

13  ability to get out of the way and to avoid a major injury

14  to himself is to his credit for being in good shape and

15  being a former athlete and those kind of things.

16          So I don't know that the defendant owns this

17  house next -- that his father's living in.  That's what the

18  representation is in the report.  I know his father has

19  lived there for a number of years, and I don't know if

20  somehow the ownership changed out of his father's name,

21  but, you know, this is going to be difficult for -- if you

22  put him on probation, it's going to be difficult for

23  Mr. Hanson to still live next to this man who's apparently

24  going to be continuing to visit this residence.  If he owns

25  it, perhaps we can't keep him from going there, but I don't

26  think there's any reason he should ever drive past

27  Mr. Hanson's house.  He can come from the other direction.

28  I don't think Mr. Hanson should ever have to deal with him

1     again.

2             And I think Mr. Hanson's position in the report

3     that the defendant get a year in custody is certainly the

4     most reasonable thing that should happen here, and I think

5     we -- he could have easily wanted a stricter sentence and

6     could go to state prison.  So we'll see -- I assume that

7     this Court is not going to send him to state prison.  I

8     think you could.  You could even send him for an evaluation

9     at the state prison.

10            He doesn't have much of a record.  It's old.  And

11    I just don't know what was going on in his mind here when

12    he tries to hit this victim, and if it wasn't for the

13    victim's agility, he would have been seriously hurt or

14    killed.  So we think at the minimum what the Court ought to

15    do is sentence him to a year in jail as a condition of

16    probation.

17            THE COURT:  All right.  Thank you.

18            Mr. Higgins.

19            MR. HIGGINS:  Thank you, Judge.  Is the Court

20    okay -- would the Court like me to make a non-prison

21    argument, or are we at the point --

22            THE COURT:  I intend to grant probation.

23            MR. HIGGINS:  Thank you.

24            So first -- I intend to ask for a reduction, a

25    17(b) reduction when I'm done speaking.

26            I will say this is -- it's hard to argue in this

27    case without sounding like victim blaming, but I think it's

28    fairly obvious at this point that both parties involved

1  were very immature on that day.  They both very much

2  contributed to what happened.  This is not to minimize what

3  Mr. Garcia ultimately did, but this has been an ongoing

4  thing.  This is not -- it stretches anyone's imagination to

5  envision this as a one-way antagonistic relationship.

6          The victim attempted to portray himself as an

7  innocent party and he was just scared, et cetera, until he

8  was confronted with the fact that he was enraged and

9  flipping Mr. Garcia off.  And then, you know, if somebody's

10  story changing is a measure of how we should handle this

11  case, then the Court can very easily look and see how many

12  different times the victim's story has changed from having

13  these negligible scratch injuries to -- that don't comport

14  with being struck and flipped in the air two to three times

15  and landing on his head, and this -- again, this is not to

16  attack the victim, but the People have brought up the idea

17  that a changing story should affect the Court's handling of

18  this case, the victim has never told the same story twice.

19          Obviously this is a petty neighbor dispute.

20  Probation nailed it on the head.  This is a stupid

21  neighborly dispute that just happens sometimes, and neither

22  side wants to admit any sort of responsibility.  And as is

23  usually the case, the truth is somewhere in the middle.  My

24  take on this is still that the injuries very much suggest

25  that these injuries were suffered falling into a bush.

26  These injuries don't match with getting struck by a car.

27  And this is again not to minimize what Mr. Garcia did, but

28  just -- it's a stupid neighbor dispute that went too far.

1    They've obviously been -- they've been surveiling each

2    other, they've been antagonizing each other.

3            I have no problem at all with the Court, as a

4    condition of probation, I think it's a good idea to grant

5    some sort of prohibition from contact between the two.  If

6    it requires Mr. Garcia to drive all the way around and not

7    even pass by his house, these two people just never need to

8    see each other again.

9            I should say, in Mr. Garcia's favor, this event

10    happened just about a year ago.  Mr. Garcia by and large

11    has been out of custody for that entire time.  I think when

12    we were in court last, the victim himself said he had not

13    seen Mr. Garcia since.  So I don't -- I think it's fairly

14    obvious at this point Mr. Garcia has no problem avoiding

15    contact when he's motivated to do so.  And so I suggest the

16    Court motivate him to do so.

17            So in light of his record, in light of his

18    letters of support, in light of the fact that again I don't

19    -- it's hard for me to make an argument without sounding

20    like I'm victim blaming here, but both parties were to some

21    degree responsible for exacerbating the situation and

22    taking it -- Mr. Garcia parking in his driveway and

23    annoying him, and he getting out of his car and flipping

24    him off and yelling and back and forth, and now today it is

25    here because it has finally gone too far.  It obviously

26    needs to stop.  But I think Mr. Garcia has definitely

27    learned a lesson here, and I think the Court can still very

28    strongly consider reducing this to a misdemeanor in light

1    of the injuries, in light of his record, and in light of

2    his behavior since this has happened.

3              As far as him not contacting him or threatening

4    him or whatever, I think the victim says he's -- fears

5    retaliation.  I think at this point Mr. Garcia has

6    demonstrated that he's not in much condition to retaliate,

7    nor does he have any inclination to.  In my speaking with

8    him, he just wants to put this past him.  I think we all

9    would like to put this past everybody involved.  So for

10   those reasons -- again, in light of his record, in light of

11   the minimal injuries, I just -- I think that very strongly

12   laid out probation terms are necessary.

13             And normally I very much object to the search

14   condition for electronic devices.  In this case I don't

15   even have an argument against that.  I think that's a good

16   check on him to make sure he's not doing the same

17   antagonistic behavior to exacerbate the back-and-forth

18   again.

19             So I would like the Court very much to consider

20   reducing this to a misdemeanor.  I don't know that a

21   substantial jail time is necessary for Mr. Garcia.

22   I think he's learned a lesson here.  They both want this to

23   stop.  We all want this to stop.  If the Court is inclined

24   to exact some sort of measure along those lines, I'd ask it

25   be more in the form of community service rather than jail

26   time.

27             And if I could have one moment, please?

28             And I've advised him that he has the right to

1   address the Court and he would prefer that I just speak on

2   his behalf this morning.

3        All right.  Thank you.

4        THE COURT:  Thank you, Mr. Higgins.

5        Any final comments, Mr. Van Camp?

6        MR. VAN CAMP:  Well, basically, without saying

7   that he's blaming the victim, the defense counsel, by

8   representing the defendant, is blaming the victim.

9        The victim did not drive his car, the defendant's

10  car, onto his property.  The defendant did not -- and then

11  the defendant intentionally tries to run him down.  It was

12  an intentional act.  It was no accident.  He never says

13  anything to the police afterwards about being an accident

14  or even admits that he went forward.  That's another reason

15  we know it's an intentional act because he never ever said

16  to the police, in two different occasions that he contacted

17  them, that it was an accident or that he was startled or

18  something like that.  He just said that he squirted his

19  hose and left and fled the area.  This was an intentional

20  act.  This jury had no problem with this case, apparently.

21       And the defense is still arguing that somehow

22  this is the victim's fault and that they both very much

23  contributed.  What did Mr. Hanson do to contribute to this

24  offense other than try and get this person off his

25  property?  This whole antagonistic relationship, I don't

26  know that that's been shown in anything, in this probation

27  report or otherwise, and I think it's mostly on the

28  defendant's part that he's antagonistic towards this

1    victim.

2              And this is not a petty neighborhood dispute.

3    This is an assault with a deadly weapon that could have

4    been a very serious offense, or was -- it is a serious

5    offense with very serious results.  And it's not anything

6    that the defendant did that prevented the serious results

7    happening here.  And this is certainly not a misdemeanor

8    and he deserves a year in custody.

9              THE COURT:  Is the matter submitted?

10             MR. HIGGINS:  Yes.

11             THE COURT:  All right.

12             MR. HIGGINS:  Oh, I'm sorry.  I should say I also

13   did review the conditions as attached, and he understands

14   the conditions as attached.  And I think our only concern

15   for a variety of reasons -- age, health, et cetera -- was

16   the amount of time in jail.  But as far as the other

17   conditions, he's willing to follow them, whatever is

18   necessary to please the Court.

19             MR. VAN CAMP:  Your Honor, and then I would ask

20   for one other condition of probation that would be included

21   maybe in these terms that are already stated is that there

22   be no postings on the internet or social media by the

23   defendant about Mr. Hanson, about his residence.  This is

24   -- there's ongoing postings that the defendant's done for

25   years.  I think all that should stop.

26             THE COURT:  Any comments about that, Mr. Higgins?

27             MR. HIGGINS:  I don't know that I have been

28   provided any proof of events that would require that

1   condition.

2              THE COURT:  All right.  Is the matter submitted?

3              MR. VAN CAMP:  Yes.

4              THE COURT:  So sort of as a starting point with

5   regard to this, I think what's really clear is that where

6   we stand right now is Mr. Garcia was convicted by a jury of

7   an assault with a deadly weapon, which is a felony.  That's

8   the reality of our situation here.

9              And I'll note that significantly, at least from

10  my perspective, what precipitated this was his decision to

11  drive on Mr. Hanson's property.  And I don't think

12  Mr. Hanson acted unreasonably, especially given the

13  background of the relationship.

14             And as I told counsel at the start of this trial,

15  I was familiar with this sort of neighborhood dispute going

16  back a number of years because of restraining order

17  violation cases that have been submitted, things of that

18  nature.  But obviously what we're talking about is this

19  particular case.  And Mr. Garcia instigated what happened

20  by making the choice to drive his car onto another person's

21  property.  And that was foolish and irresponsible and

22  ultimately led to him being here, convicted of a felony,

23  and looking at being sentenced on a felony.

24             In terms of whether or not to grant a misdemeanor

25  at this point, the Court denies that request.  And I do

26  that based on the facts of the case, the conduct here,

27  which it's correct to point out that the injuries could

28  have been much more significant given the conduct here.

1   And as well as, frankly, the comments made by Mr. Garcia

2   after the jury verdict was suggested that he really didn't

3   quite comprehend and understand his culpability or

4   responsibility here.  Even if you're looking at this --

5   even if you accept his current contention that it was an

6   accident, I'm not hearing a lot in the way of regret over

7   the consequences in particular to Mr. Hanson.  So the 17(b)

8   is denied.

9           With regard to the recommendation, I understand

10  the arguments made on both sides in terms of no jail versus

11  a year in jail, and frankly I think when you look at it all

12  together, when you look at the conduct here, when you look

13  at the background of the defendant, I think Probation's

14  assessment of a hundred twenty days in the county jail is

15  appropriate.

16          I am going to add a Condition 22 as requested

17  that Mr. Garcia is not to make any postings on the internet

18  with regard to Mr. Hanson or his property.  I think that's

19  fair and I think it's appropriate under the circumstances.

20          MR. VAN CAMP:  Would that include social media,

21  your Honor?

22          THE COURT:  Yes.

23          MR. VAN CAMP:  Thank you.

24          THE COURT:  And that would be -- I've written it

25  in here.  That would be Condition No. 22.

26          Mr. Garcia, have you gone over all the terms and

27  conditions of probation as set forth in the probation

28  report, as well as the added condition that I included?

1        THE DEFENDANT:  Yes.

2        THE COURT:  And do you accept the terms and

3  conditions?

4        THE DEFENDANT:  Yes.

5        THE COURT:  All right.  So in this matter I'll

6  order a $40 court security fee, $30 criminal conviction

7  assessment.  There is a pre-sentence report fee of $560 and

8  an annual supervision fee not to exceed $240.

9        Imposition of sentence is suspended.  You're

10  placed on three years of formal probation on Conditions 1

11  through 22 as recommended and modified by the Court.

12        You're to serve 120 days in the county jail.

13  That's a day-for-day case.  Credits are four plus four for

14  a total of eight.  I'll have you surrender to serve the

15  balance of the sentence on -- let's do November 14th.

16        There are the testing and treatment conditions as

17  set forth in the recommendation.  You're not to own or

18  possess any firearm, ammunition, or other dangerous or

19  deadly weapon.  There's a $300 restitution fine, $182

20  booking fee --

21        MR. HIGGINS:  Your Honor, I apologize.  I

22  neglected to fill out a financial affidavit with him.  If

23  the Court would not mind re-addressing that momentarily.

24        THE COURT:  If he wants to fill that out, I can

25  review that.

26        MR. HIGGINS:  Thank you.  I apologize.

27        THE COURT:  In addition, there's Conditions 19,

28  20, and 21 which are the no-contact and stay-away order

1    with regard to Mr. Hanson, including the at least 75 feet

2    away from his residence and place of employment.  That

3    means you can't even drive by the house.  Do you understand

4    that?

5              THE DEFENDANT:  Yes.

6              THE COURT:  All right.  And no postings on the

7    internet or social media with regards to Mr. Hanson or his

8    residence.

9              All right.  You are ordered to report to

10   Probation today.  We'll pass this for your hearing on

11   attorney's fees.  And there will be paperwork for you

12   before you go.

13             MR. HIGGINS:  Thank you.

14             THE COURT:  All right.  Thank you.

15             (Pause in the proceedings.)

16             THE COURT:  All right.  We are back on the record

17   on the Garcia matter.

18             Mr. Garcia, I have your statement of assets.  So

19   you have an ownership interest in the house on -- at 563

20   Monroe?

21             THE DEFENDANT:  Yes, joint owner.

22             THE COURT:  Is that a joint tenancy?

23             THE DEFENDANT:  Yes.

24             THE COURT:  All right.  And the amount owed on

25   the mortgage is 54,000?

26             THE DEFENDANT:  Yes.

27             THE COURT:  All right.  Do you have anything else

28   you want to tell me about your ability to pay attorney's

1  fees?

2          THE DEFENDANT:  Um, that's about all I got is

3  social security disability and workmen's comp.  That's the

4  only source of income I get.

5          THE COURT:  Okay.  Yeah.  The ownership of the

6  property means you have the ability to pay.  You've got a

7  substantial amount of equity in that.  So I am going to

8  order that you pay attorney's fees.  I do find that you

9  have the ability to pay.  I'll set the attorney's fees at

10  $2200.  All right.  Yes.

11          THE DEFENDANT:  I got no homeowner's insurance

12  and the City of Napa damaged my home.  They signed the

13  permit and the City of Napa said our home is not safe, it's

14  unsafe.  So they red-tagged the house because they okayed a

15  foundation to be poured, but then after it was poured they

16  said that it was not the proper foundation to be poured.

17          THE COURT:  So I'll tell you what.  I'll tell you

18  what.  I'm going to make the order.  I'm going to give you

19  the option to file something in court to come back here to

20  have me reconsider the attorney's fees, and you can provide

21  me any documentation that suggests that the house is not --

22  will not -- is not of a value that you could utilize to pay

23  your attorney's fees.

24          THE DEFENDANT:  Okay.  So I'll let you do that.

25          MR. HIGGINS:  Thank you.

26          THE DEFENDANT:  Thanks.

27          (The proceedings were adjourned at 9:15 AM.)

28                  --oOo--

1418

1  STATE OF CALIFORNIA          )
                                )     ss:
2  COUNTY OF NAPA               )

3

4            CERTIFICATE OF OFFICIAL REPORTER

5

6            I, MICHELLE CORRIGAN, a duly appointed,

7  qualified and acting Official Shorthand Reporter of the

8  Superior Court of the State of California, in and for the

9  County of Napa, do hereby certify that on Tuesday, October

10 25, 2017, I acted as the Official Shorthand Reporter on the

11 proceedings of the case of THE PEOPLE OF THE STATE OF

12 CALIFORNIA vs. PERFECTO GARCIA, NSC No. CR183040.

13           AND THAT I took down in shorthand the testimony

14 and proceedings had therein; that thereafter I transcribed

15 the same into longhand typewriting, and that the foregoing

16 transcript, pages 1401 through 1417 inclusive, comprises a

17 full, true, and correct transcript of the proceedings had,

18 all rulings, acts or statements of the Court, all

19 objections or exceptions of counsel, and all matters to

20 which the same relate on the trial of the above-entitled

21 action insofar as the same have been requested by the

22 Appellant and ordered by the Court.

23           DATED this 21st day of February, 2017.

24

25                               _____
                                 MICHELLE CORRIGAN
26                               CSR No. 9079
                                 Official Shorthand Reporter
27                               Napa, California

28

EXHIBIT B.

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF NAPA

The Honorable FRANCISCA P. TISHER, Judge

-oOo-

R. GARCIA,                        )
                                  )
                Plaintiff,        )
                                  )
vs.                               )       No. 26-21550
                                  )
D. HANSON,                        )
                                  )
                Defendant.        )
                                  )

-oOo-

REPORTER'S TRANSCRIPT OF THE HEARING
HELD ON JUNE 19, 2003

-oOo-

A P P E A R A N C E S:

FOR THE PLAINTIFF:          RUDY GARCIA
                            In Pro Per

FOR THE DEFENDANT:          DARREL HANSON
                            In Pro Per

REPORTED BY:
CHERYL JENSEN
CSR 9033

COPY

JUNE 19, 2003

THE COURT: The Court will call Darrel Hanson and Rudy Garcia and, Mr. Garcia, if you will both stand up and raise your right hand to be sworn.

DARREL HANSON & RUDY GARCIA,

having been duly sworn,

testified as follows:

MR. HANSON: I do.

MR. GARCIA: I do.

THE COURT: Mr. Garcia, this was just brought up from downstairs.  I haven't had a chance to read it.  I didn't want to read it if Mr. Hanson hasn't seen it.  Let me return it to you.  If you think that it's something that we should both see, we can review it.  I can't see something he doesn't see.  If you want him to have a copy --

MR. GARCIA: With that just before this was a restraining order took effect that we put the restraining orders on each other, this was an ongoing investigation in regards to two police officers that keep coming; and this is pertaining to this restraining order, and I believe I haven't got an answer what they are going to do with this police officer in regards to the reports regarding Mr. Hanson.

THE COURT: Well, I was just going to have a brief discussion to see if this is something that can be resolved today.  If it can't, then I am going to give you another

1    hearing date at some other time.

2        MR. GARCIA: I agree with it 100 percent that it should

3    be resolved today.

4        THE COURT: I don't know if it will. I hope so.

5        MR. GARCIA: The matter is that we would like to have

6    the restraining order whether it's his or ours whatever is

7    going to happen. Your Honor, is that there is a hearing

8    regarding the district attorney that's also regarding right

9    here to the lasers that they took a report for my two sons.

10   They turned it to the police department. He's still going

11   to the district attorney regarding that situation so it's

12   still pertaining to this right here and right now we feel

13   that Mr. Hanson understand the influence he doesn't know

14   what he is doing and the police department --

15       THE COURT: Well, wait a minute and have a seat. And

16   all I was saying I was returning that letter. I am happy

17   to read this letter. You need to give it to Mr. Hanson as

18   well. I want to ask a couple of questions and then we'll

19   see whether we can take care of this today or whether we

20   need to set it at a different time, and I'd like to ask

21   both of you just some brief questions. I am going to have

22   Mr. Hanson without going into why or what you need, what

23   would you like to see happen today as far as we are looking

24   at both cases now, and I understand you would like a

25   restraining order of some sort. To resolve this matter,

26   what would be your proposal, something that you think Mr.

1   Garcia would be able to live with and you live with that

2   addresses both concerns?

3       MR. HANSON: I'm not contesting this restraining order.

4   The only thing that I am contesting is the 20 yards from

5   his vehicle.  My house is barely 20 yards from his vehicle

6   so that would be a little bit hard to not be able to do.  I

7   can't drive down the street otherwise and the monetary

8   amount he's asking for, I'm contesting.

9       THE COURT: So if I understand correctly, you would be

10  in agreement that you would not contact him, he would stay

11  away, wouldn't go around his property and perhaps if it was

12  just a few feet away so that --

13      MR. HANSON: Go upon my normal business about driving

14  upon the street.  I won't walk my dog passed his house

15  anymore.

16      THE COURT: Go across the street.

17      MR. HANSON: Other than go the other way, I can't drive

18  my vehicle down the street in the normal manner, otherwise,

19  I would not look at him, talk to him, or anything.

20      THE COURT: So if Mr. Garcia agrees that he will drop

21  any financial request, you agree that you will stay away

22  from his property, not walk the dog or go by his property,

23  go on the other side of the street just a few feet away.

24      MR. HANSON: I have a financial request against him in

25  my counter claim and I will drop that as well if he is

26  willing to drop his monetary amount that he is asking for.

THE COURT: And is that acceptable to you?

MR. GARCIA: Your Honor, I believe that's very close to what I have learned so far from the records to the police coming over that the restraining order does not keep him from driving on the street. It's just in regards to the contact that he's having with us. So I understand that part, yes. There is only one thing, I will be wanting to get -- to buy the transcript of the hearing of today, the minutes.

The district attorney I believe is receiving medical status bills from whatever my son, the damage to his eye regarding this case that the district attorney's got on Mr. Hanson.

THE COURT: Just so we are clear because we have different courts here on both sides of the street and we handle different matters. The only case that's before me right now are these two that the two of you have brought against each other and I understand that there may or may not be something else going forward. Now whether either of you are speaking to the district attorney, that's up to you what you decide to do. If either of you file a criminal action, the district attorney is the one who makes a decision as to whether they believe there is enough evidence that, one, there has been a crime committed and they feel there is enough evidence to bring that before a jury to have a jury decide guilty or not guilty. So I'm

just saying that there is no confusion if a criminal case
is going forward, I don't have anything to do with it, and
none of the judges will be making the decision if a
criminal complaint will be filed because the district
attorney makes that decision.  Does that make any sense?

MR. GARCIA: Yes, it does.  I wanted it to be on record
for the reason is that I had experience with other
restraining orders to where the judges that we went to
before attorneys that were handling the restraining orders
never did clear up one fact that the restraining orders
were mutual and that the person that did the restraining
order didn't complete the whole restraining orders.  The
person did was no proof of service.  The restraining order
was reraised where it said mutual and put no further
information on it, and it stated if it was mutual was a 40
yard distance.  All the time my family, my granddaughter
and friends that were coming over were violating the
restraining order.  They lived right across the street.

THE COURT: Is there a restraining order in effect right
now?

MR. GARCIA: No.  No.

THE COURT: You're talking about a past experience?

MR. GARCIA: Yes.  Judge Bennett was the one that
straightened it all out.  We went for about a
year-and-a-half and these people tried to get us on
contempt.

1   THE COURT: Well, I understand Mr. Hanson's not

2   requesting a restraining order.  He's stating that he's

3   agreeing to your request as long as you drop the financial

4   issues.  Whether or not a criminal complaint is filed by

5   either one of you is a separate issue and I don't want to

6   mislead either of you to think that by resolving this that

7   takes care of the criminal matter because none of us here

8   have the authority to make that decision.  That's done by

9   the district attorney.

10   MR. HANSON: Your Honor, I am asking for a restraining

11   order.  I am trying to resolve the July 3rd date at the

12   same time.

13   THE COURT: So your request would be that the

14   restraining order would be issued in the same manner with

15   Mr. Garcia to stay 20 yards from your -- a few feet from

16   your property?

17   MR. HANSON: Yes.

18   THE COURT: So do you understand what Mr. Hanson is

19   proposing?

20   MR. GARCIA: Yes.

21   THE COURT: What is your position?  Is that acceptable

22   to you?

23   MR. GARCIA: It's acceptable to me.  The one thing I'm

24   not the one that's responsible for whatever actions the

25   district attorney or police --

26   THE COURT: Absolutely. That's what I was trying to make

that point as well that you may ask for a complaint to be filed, you may ask for a complaint to be filed, I may ask for a complaint to be filed, but it's up to the district attorney to decide to make that decision as to whether or not he's going to pursue something. He is bound to follow certain requirements which is that he has to believe that an offense was committed and there is enough evidence to prove it.

MR. HANSON: Your Honor, if I can make one statement?

THE COURT: Sure.

MR. HANSON: Just so the Court knows, I am another victim of the Garcias. He has had numerous lawsuits within the neighborhood and numerous people have moved out of the neighborhood for the harassment of the Garcias. He has 4 cameras attached to his house which one of them is on the back of his premises pointing right into my house and inside my backyard and no where else. When I go outside, all of the cameras are on my house, are on me which is no problem; but they come outside with the hand-held camera with their finger flipped up in the air to antagonize me to get me to say something.

When I'm walking my dog, they constantly come down with the cameras and put it in my face and this part needs to be addressed as far as the harassment. I don't mind the cameras and surveillance, but, you know, hold a camera on me, two cameras on me and antagonize me, that part of the

harassment I'm asking for it to stop.

And in addition, I have lived there for 8 years, owned that house and now I am going to put my house up for sale and move.  I have to  because I can't take this any more.

What I am also hoping is going to happen -- a year ago I got a DUI.  I'm on probation for a DUI.  Nothing more. And what I am afraid is Mr. Garcia pull out a video tape from 8 years in the past and he's going to call the police and say I violated my probation and I will be back in jail.  And that's my problem.  He has 8 years of tapes on me and he has the tapes when I moved in the house 8 years ago.  He has asked me if I want to see them any time. That's what I am afraid of.

THE COURT:  I understand your concerns and I will let Mr. Garcia answer these.  Just in regard to the tapes, unless a foundation can be set for the tapes, they wouldn't be admissible.  To set forth the time frame, I mean I would assume if it has a picture of you, it would show that you were younger than you are today.

MR. HANSON: Well, it would be last week or the week before.  Before this was put into effect.  You know, they have -- every day I leave the house, the cameras come out and it's on me.

The camera that's pointing in my backyard in a window of my house, the police officers say they can't do anything, that's a civil matter.  I'm not sure what that

camera is for exactly.

THE COURT: Let me hear from Mr. Garcia.  Do you wish to respond to the concerns Mr. Hanson's mentioned here today?

MR. GARCIA: Yes, your Honor.  I have three surveillance cameras in the front of my house, and the reason I have them there and have them there for the last 20 to 30 years is that a person broke into my house and never could find out who it was.  They stole some of my valuables and antique tools that I have.

As far as what he was saying in regards to the camcorder, the police advised us in order for us to get a restraining order, we had to have facts, proof, and for us to camcorder Mr. Hanson when he comes to the house and does whatever he wants to call on the police reports.

To make a long story short, I have a picture here that you can see yourself and this is in regard to my 3 cameras on the front of the house, Mr. Hanson's house is no where near.  His house is not there.  Those are for the street.

MR. HANSON: One of those is actually showing my front yard.

THE COURT: I'm not sure what is what here.  I will have the deputy provide it to you.

MR. HANSON: I have no problem with the front.  It's the one pointing to my backyard, the one he recently put up within the last 30 days.

THE COURT: Just a moment.  If you would like to write

on there, we can make a copy of it.  Perhaps you can

indicate whose house is whose, cars, because I don't know

Do you have a copy?

MR. GARCIA: I have it here.

THE COURT: Well, what do you want to tell me about this

picture?

MR. GARCIA: Can I come forward?

THE COURT: No.

MR. GARCIA:  Do you have an extra one?  I don't have my

reading glasses.

THE COURT: Point to it.  I can see where you are

pointing to.

MR. GARCIA: Holding it upright, by the word play, there

is a white truck and Jeep, that's mine.  On the next corner

onto the right is a telephone pole and there is a small

car, Escort, a red one, and that is mine and that's on the

front of a neighbor by the name of Joe Vega.  We have been

neighbors for 35 years him and I.  And the car in the

driveway, that happens to be my Lincoln.  Now Mr. Hanson's

house is not seen from these cameras, security cameras at

all.  The only time that he was seen, he was out on the

sidewalk.

THE COURT: So why are you showing me this?  To let me

know the 3 cameras don't show his house?

MR. GARCIA: Not at all.

THE COURT: He doesn't have concerns about these.  He

was more concerned about a camera that he believes was
going into his window, his back window.

MR. GARCIA: His kitchen window faces my neighbor's
house, the driveway.  There is no way that from my house --
there is a house in between ours, his house and mine.
There is no way that there is a camera that can go through
my neighbor's house.  It's not made of glass or whatever.

THE COURT: You're saying that you live in one house
and there is a neighbor in between your and Mr. Hanson's
house?

MR. GARCIA: Yes.

THE COURT: Hold on a moment.  What window of your house
is that?

MR. HANSON: One right above -- it's a utility area in a
kitchen at the far end.  It's a pantry area basically. I
can see the camera and then when I go outside right around
that area, get up on a ladder, you can see that it's
pointed directly into my backyard/ window.  When I walk
passed the window, he can see me.

THE COURT: When you say window, is it the pantry?

MR. HANSON: But it is inside my residence.

MR. HANSON: And you can see how wide of an area this
is.  It shows all the way across the street at least 25
feet and then spans out another 25 feet.  So it doesn't
have to be directly at my window if he can move it over
just a couple of inches, you see what a wide span from a

house-and-a-half from one house away. My house is where this Vega is parked on this far right-hand corner top.

THE COURT: I think he said a red Escort.

MR. HANSON: Approximately 25 feet past that is my residence. Where my sidewalk starts, you can see the span of the camera. It doesn't have to be pointed at me, it's pointed at my backyard/ window.

THE COURT: Okay. Anything you want to say about the camcorder?

MR. GARCIA: Yes. This is what his complaint is it should be filed with this case that he is referring to us camcordering, yes, that is part of what is going on with the district attorney that was turned in by the 2 -- my 2 sons. That this is what Mr. Hanson, he comes over to the property next door, the neighbor that lives next door, and did this to one of my sons, the one that has eye injuries regarding this laser that he pointed at him.

THE COURT: Okay. Well, if I understand correctly, you are both in agreement to stay away from each other's property. Mr. Hanson is not going to be shining any lasers in your property because he's not going to be that close. And do you have any objection to just moving that camera, the back one, so that it doesn't go in his backyard?

MR. GARCIA: It has nothing to do with his backyard. It does not show the backyard. That camera was installed -- my neighbor suggested we put the camera up so he is --

because he doesn't want Mr. Hanson to get on the roof and throw rocks at my dog in the backyard.

THE COURT: He won't be throwing rocks there anymore. We are going to have that restraining order.  Do you have any objection to just moving that angle of that camera over?

MR. GARCIA: It's got nothing to do with his backyard.

THE COURT: I understand that you don't think so.  Do you have any objection to moving it over so it doesn't go into the backyard or into his pantry window?

MR. GARCIA: It's only my neighbor's backyard.  It's not affecting his backyard at all.

THE COURT: Are you telling me when you look through the lens, you would not see any of his backyard?

MR. GARCIA: Nothing at all.  It's got the industrial park behind us.

THE COURT: You stated that the reason you put it in is so that you could make sure that Mr. Hanson doesn't get on the roof and throw rocks in your backyard.

MR. GARCIA: Exactly.

THE COURT: What do you have it aimed at?

MR. GARCIA: Aimed exactly at my neighbor's yard, his garden.  And the camera is -- it cannot be aimed like you do a rifle or anything or arrows.  It is placed towards where it has my neighbor's backyard.  It has the industrial park and tree tops. He has a tree on his property that is

about 60, 70 feet tall.  It has part of that, but it does
not have anything to do with his house at all.  In the
winter when the leaves come off my neighbor's trees or the
trees he has, we will see his roof of the garage.

THE COURT: Are you willing to just move it over?

MR. GARCIA: Yes, I am.

THE COURT: So that his concerns whether they are --

MR. GARCIA: Yes.

THE COURT: -- reality or not --

MR. GARCIA: Yes.

THE COURT: Thank you.  Then the Court will make the
following orders that each party is to stay away from the
other person and the other's residence.  The stay away is
just a matter of feet.  Let's say five feet from each
residence and each other's vehicles within reason.  I mean
we understand that there may be things that happen.  We are
not trying to get into any technicality.  We realize that
the two of you are neighbors, not right next door, but
neighbors and I do want to congratulate both of you on the
fact of reaching a resolution; and I know that obviously
this isn't the type of relationship we would like for
neighbors.  We like it better when people are able to speak
to each other and work these things out without having to
go to court.  Sometimes this is the only way that this can
be done.  I'm glad that the Court can be here to at least
be a way to communicate.  I do think that the two of you

both have made some concessions in attempting to work this out without having a full day of litigation or less.  And I really hope that by doing this and both of you being as cooperative as you were today, that you can work on this so that at least you never have to like it, but at least you can go about your business in the neighborhood without having to be upset each time you see the other person.  Do either of the you have orders after hearings?

MR. HANSON: No.

THE COURT: I'm going to call the court facilitator and see if she is still available, if she can come up.  Do you have an order after hearing?

MR. GARCIA: No, I did not.

THE COURT: I am going to have the court facilitator come up and see if we can get these prepared so that you can view the other person's restraining orders and make sure that it's exactly as we mentioned here.

As far as the length of time that each of you wants this, do you want it for -- I don't know that it's necessary to have it for three years.

MR. HANSON: It won't be very long, I'm moving.

THE COURT: Six months.

MR. GARCIA: It will be for me three years.

THE COURT: How about six months?

MR. HANSON: I will be gone by then.

MR. GARCIA: Three years, your Honor.

THE COURT: I'm not going to do three years unless we go forward on the whole hearing because this was by stipulation so --

MR. GARCIA: I am just being realistic.  There is an industrial park behind me and Mr. Hanson has been seen by some of the people that have businesses in the industrial park coming to the back end of my house and getting on pallets left by the companies that are back there, wine pallets, and he puts them against the fence, and people have seen him do this.  I'm concerned about him moving and coming back to the neighborhood and doing this.

THE COURT: Let's make it for six months with the understanding you have the right whether it's three years, six months, or one year, whatever is determined, you may come back before that time expires and indicate you need to have it extended; and if in fact there is some valid reason; you of course have to give notices, if there is some valid reason, it can be extended for three years at that time.

MR. GARCIA: Yes, your Honor.  I am just following what the police have told me.  They have suggested that I bring this to your attention, the judge's attention at the court.

THE COURT: I am happy to, but we will set it for a hearing.  With this going forward by way of stipulation, I'm not going to make an order unless both of you agree; and what I am saying, you can do this today and have it for

1   six months.  Mr. Hanson indicated that he's hoping to move

2   and this may be a moot issue.

3       MR. GARCIA: Well, I will be plain as can be, I do

4   not --

5       THE COURT: Well, let's set it.  When would you like to

6   have your hearing?

7       MR. GARCIA: I'm flexible, your Honor.

8       THE COURT: Mr. Hanson.

9       MR. HANSON: Whenever.

10      THE COURT: Do you want to agree to have these three

11  years restraining orders against you?

12      MR. GARCIA: That's fine.  I will be out and he will

13  never see me again.  Whatever.

14      THE COURT: Three years for each side.  We are still

15  waiting -- she's not available right now.  What I am going

16  to ask then is we will close the courtroom at this time.

17  Mr. Garcia if you and whomever is with you, if you would go

18  to the other side of the stairway and if Mr. Hanson you and

19  whomever would stay on this side of the stairway, when the

20  court facilitator comes in, if she could come see me

21  first.  We can explain what it is we are looking at and

22  have each of you review the other and make sure that it's

23  acceptable and we can get this done and put it behind you.

24      MR. HANSON: I wonder between six months and three years

25  because I am going to be moving in three months.

26      THE COURT: She was on her way.

MR. HANSON: You know.

THE COURT: It's up to you.  I'm only going to order three years if you agree, otherwise, I will set it for a hearing and you can prove your case.

MR. HANSON: To me it's silly, but yeah, I will agree because I don't have time to take off work.  I have a job.

THE COURT:  You may always make a motion to have the matter reheard and explain why you want it terminated sooner.

MR. HANSON: Right.

THE COURT: She's coming.  Thank you for coming up.  The parties here, Mr. Hanson and Mr. Garcia, they have filed request for restraining orders against each other.  Mr. Hanson's was actually set for July 3rd, but the parties agreed that they may be heard concurrently.  They both have agreed by stipulation that there will be restraining orders against the other.  Because they are neighbors, there is actually one house in between them, we are not doing the standard 100 yards, but more something like such as 5 or 10 feet.  There is a previous concern that Mr. Garcia has one -- he has four surveillance cameras. Three of them go out to the front area.  None of these are a problem.  There is one in the back that Mr. Hanson felt was being directed at least part of it showed his backyard and window into his pantry.  Mr. Garcia indicated that was not the case, but he's willing in any event to move the angle of the camera

or somehow move that so that there is no question that that's not an issue.

There has been some concerns that Mr. Hanson had been shining a laser near the house and he indicated that that's not going to be happening in the future as well.  Neither one of them have prepared any proposed orders after hearing and I was hoping that you would be able to do that, and once they have been prepared, the one for Mr. Hanson against Mr. Garcia could be shown to Mr. Garcia to make sure it's in order and the one with Mr. Garcia against Mr. Hanson so both sides can see that they are identical in that in effect they are orders that would not cause them to be in any technical violation as best we can.

I think the parties there was some disagreement as to how long the restraining order would be needed. Mr. Hanson indicated that he is hoping to move.  He's going to place his home up for sale here soon so he doesn't think that there would be a need for much more than three months.  I proposed six months, but Mr. Garcia requested three years. Mr. Hanson indicated rather than contest that issue that he would agree that the restraining orders would be three years against each other.  I have advised the parties that if they feel there is a change of circumstances, they may all request to come in and have the restraining order terminated.

I asked Mr. Garcia and his group to go over to the

1    other side of the stairway and Mr. Hanson to stay here, but

2    if you want to take them to your office, or if there is one

3    way what you would like us to do --

4        COURT FACILITATOR: Either party can come with me now

5    and the other one stay up here and then I will come and

6    switch them around.

7        THE COURT: Mr. Hanson, why don't you go with Ms. Priest

8    and then as soon as she is done, but don't leave because we

9    want to make sure both orders are approved.  I thank you

10   for coming in and working this through.

11

12                              -oOo-

13

14

15

16

17

18

19

20

21

22

23

24

25

26

STATE OF CALIFORNIA)
                    ) ss.
COUNTY OF NAPA      )


    I, CHERYL E. JENSEN, Certified Shorthand Reporter, do hereby certify and declare that I was the duly appointed and acting Stenographic Reporter of the Superior Court of the State of California, County of Napa, on the hearing of the foregoing matter held on June 19, 2003; that the foregoing is a complete, true and correct transcription of the stenographic notes as taken by me in said matter.

    Dated this 1st day of July 2003.


CHERYL E. JENSEN, CSR
Certificate No. 9033

```
 1                  SUPERIOR COURT OF CALIFORNIA

 2                      COUNTY OF NAPA          EXHIBIT N

 3        THE HONORABLE MICHAEL S. WILLIAMS, COMMISSIONER

 4                         --oOo--

 5    SARAH CURTIS,                        )
                                           )
 6              PETITIONER,                )    NO. 26-32739
                                           )
 7        VS.                              )
                                           )
 8    RUDY GARCIA,                         )
                                           )
 9              RESPONDENT.                )
      _____)
10

11                         --oOo--

12        REPORTER'S PARTIAL TRANSCRIPT OF PROCEEDINGS

13                         --oOo--

14                    NAPA, CALIFORNIA
                   TUESDAY, MARCH 7, 2006
15                     11:00 A.M.
                         --oOo--
16

17

18

19

20

21

22    REPORTED BY:

23    DONA M. COBLE, RPR
      CSR NO. 12295
24

25

26

27               NAPA COUNTY OFFICIAL REPORTERS
                  1111 THIRD STREET, SUITE 217
28                NAPA, CALIFORNIA  94559-3001
                       (707) 299-1191
```

1

1    A P P E A R A N C E S

2

3    FOR PETITIONER:              SARAH CURTIS
                                  IN PRO PER
4                                 554 MONROE STREET
                                  NAPA, CA   94559
5

6

7    FOR RESPONDENT:             NO APPEARANCE

8

9    ALSO PRESENT:               RICHARD ELDRIDGE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                                        2

<u>I N D E X</u>

PAGE

APPEARANCES

2

PROCEEDINGS

4

CERTIFICATE OF REPORTER

9

<u>E X H I B I T S</u>

NONE OFFERED

TUESDAY, MARCH 7, 2006                          11:00 A.M.

-ooOoo-

P R O C E E D I N G S

THE COURT:  Sarah Curtis and Rudolfo Garcia.

Is Sara Curtis here?

MS. CURTIS:  Yes.

THE COURT:  Thank you.  Please come forward.
Please take a seat at the table, Ms. Curtis.

Ms. Curtis, I don't understand.  You haven't
submitted your papers.  Why is it you want a restraining
order for Mr. Garcia?

MS. CURTIS:  Because I had filed, I guess, a
complaint through the police department of an incident that
had happened of us arguing with each other, and then he hit
my car with his hand, and I thought he was going to hit me.

THE COURT:  When did that occur?

MS. CURTIS:  About -- it happened two weeks ago
this last Saturday.

THE COURT:  All right.  Has anything happened since
then?

MS. CURTIS:  No.

THE COURT:  And other than hitting your car with
his hand, did he do anything else?

MS. CURTIS:  No.  Well, yeah.  No.  Just, we were
just arguing and stuff.

THE COURT:  I don't understand why a person -- I
mean, I can understand a person getting angry, and I can
understand a person hitting a car.  A restraining order is a

4

1    pretty serious restriction on somebody's ordinary freedom, so

2    hitting your car with his hand doesn't strike me as the kind

3    of violence that would justify a restraining order.

4           MS. CURTIS:  Well, the history of my family and him

5    have gone back way far and everything is just leading up to

6    this and they just -- I don't know.

7           MR. ELDRIDGE:  May I have permission to speak?

8           THE COURT:  Who are you?

9           MR. ELDRIDGE:  I'm her step-dad.

10          THE COURT:  Do you live there?

11          MR. ELDRIDGE:  Yes, I do.

12          THE COURT:  Sure.

13          MR. ELDRIDGE:  Mr. Garcia on a weekly basis calls

14   the police department to harass us and the fire department.

15          THE COURT:  I can't stop him from calling the

16   authorities.

17          MR. ELDRIDGE:  I know.  This is not the first

18   incident.  Two weeks ago, on Saturday, he pushed me around

19   because there's a court case against him, and he doesn't want

20   me to -- he threatened me -- and he doesn't want me to --

21          THE COURT:  What was the threat?

22          MR. ELDRIDGE:  He poked me and he says he's going

23   to turn me into the authorities for things that I've done in

24   the past, that it was only him calling and getting a police

25   report on, which was all found false.

26          THE COURT:  I can't restrain a person from calling

27   the police.

28          MR. ELDRIDGE:  Okay.  But he's getting physical.

                                                              5

1   He did this 15 years ago with my dad, beat my dad up, right
2   after a heart operation.  He's swinging at her and chasing
3   the other kids down the street with his car.

4            THE COURT:  Tell me about chasing somebody down the
5   street.  When did that occur?

6            MR. ELDRIDGE:  About a month ago.  Three months
7   before that his son tried to run over one of the neighbors.
8   I mean, this guys's just been out of control for a while.
9   Swinging at her and missing her and hitting her car, that's
10  pretty serious when he's not even -- we're not even doing
11  anything.

12           THE COURT:  All right.

13           MS. CURTIS:  Basically, every night I come home I
14  am looking all around making sure he's not around.  I watch
15  my car constantly in the morning making sure he's not going
16  do anything to my car.  I'm tired of waiting for him to do
17  something, because he does have a pretty good temper going
18  on.

19           THE COURT:  How far away does he live from you?
20           MS. CURTIS:  Across the street.
21           THE COURT:  Right across the street, so that
22  wouldn't be 50 yards.  It would be less than 50 yards.
23           MS. CURTIS:  I don't know what 50 yards is.
24           THE COURT:  Well, let's see, a football field is
25  100 yards, so it would be a lot less than half a football
26  field.

27           MS. CURTIS:  Yeah, okay.  I don't know.  Just
28  whatever.  Just not onto our side of the street.

1          MR. ELDRIDGE:  He follows us to our work and the

2     son's.

3          THE COURT:  All right.  I said he's suppose to keep

4     10 yards away from you and the other folks here and your jobs

5     and work places --

6          MS. CURTIS:  Yeah.

7          THE COURT:  -- and vehicles and school, and but

8     I've also said he may come and go to his residence.

9          MS. CURTIS:  Yeah.

10         THE COURT:  We'll have a hearing on March the

11     30th.

12         MS. CURTIS:  Okay.

13         THE COURT:  At 8:30 in the small courtroom

14     downstairs on the first floor.  At that time I will listen to

15     both sides and decide whether to issue permanent orders.

16         Sir, what is your name?

17         MR. ELDRIDGE:  Richard Eldridge.

18         THE COURT:  Mr. Eldridge.  Thank you.

19         All right.  We will get the papers down for filing.

20     I'm not able to grant you your fee waiver because your income

21     exceeds those guidelines.  I've ordered that the sheriff's

22     service be provided for free.  The sheriff will provide the

23     service at no cost.  You can go downstairs and arrange to pay

24     for the filing fee, and we will get the papers to the

25     sheriff, and you can pick up your copies this afternoon.

26         MS. CURTIS:  Okay.  Thank you.

27         THE COURT:  Be sure you go to the sheriff tomorrow

28     so that you can arrange for service.  They need to speak to

1    you and have you fill out some papers at the sheriff's
2    office.
3              MS. CURTIS:  Thank you.
4              MR. ELDRIDGE:  Thank you very much.
5              (Proceedings concluded.)

6



11 Pages

| | |
|---|---|
| Social History Type | Response |
| Smoking Status | Former smoker; Date Tobacco Verified 08/21/2018; entered on: 8/21/18 |

## Assessment and Plan

Extracted from:

**Title:** AKI, other issues          **Author:** Garcia, Steven M., M.D.          **Date:** 7/5/18

Impression and Plan

Diagnosis

AKI (acute kidney injury) (ICD10-CM N17.9, Discharge, Medical)

Dehydration (ICD10-CM E86.0, Discharge, Medical)

Shoulder pain (ICD10-CM M25.519, Discharge, Medical)

Plan

Condition: Improved, Stable.

Disposition: Discharged: Time 07/05/18 18:48:00, to home.

Patient was given the following educational materials: Kidney Problems, DEHYDRATION (6y-Adult).

Follow up with: If you had an X-Ray, Ultrasound, CT scan or MRI performed during your ER visit, it is VERY important that you have the study and the Radiologist's report reviewed by your follow up physician/clinic; Loc Nguyen 1) Temporarily stop taking your blood pressure combination pill HCTZ-Lisinopril. Start taking it again after you talk to your doctor

2) Make sure you eat and drink plenty over the next several days and you should be urinating 4-5 times a day.

3) You need to either see your doctor in the next 3-5 days or return to the ER if you are unable to see your doctor to get a repeat blood test for your kidneys.

You have an appointment at 2:20PM on Monday, July 9th with Dr. Nguyen. Be prepared to go in earlier to get your blood drawn first

Return to ED if symptoms worsen.

Counseled: Patient, Regarding diagnosis, Regarding diagnostic results, Regarding treatment plan, Patient indicated understanding of instructions.

Notes:

Time Seen by ED provider:

07/05/18 13:06

, Preliminary evaluation completed by Bridget Nestor-Arjun, DO and documented in their presence by Nitin Saukhla, This note is prepared by Liselle Bartolome acting as Scribe for and in the presence of Steven Garcia, MD, I, Steven Garcia, personally performed the services described in the documentation, reviewed the documentation, as recorded by the scribe in my presence, and it accurately and completely records my words and actions.

.

| Most recent to oldest [Reference Range]: | 1 | 2 |
|---|---|---|
| UA Color [Yellow] | Yellow (7/5/18 2:15 PM) | |
| UA Appear [Clear] | Clear (7/5/18 2:15 PM) | |
| UA Spec Grav. [1.003-1.030] | 1.012 (7/5/18 2:15 PM) | |
| UA pH [4.5-8.0] | 5.0 (7/5/18 2:15 PM) | |
| UA Protein [Negative] | Negative (7/5/18 2:15 PM) | |
| UA Glucose [Negative] | Negative (7/5/18 2:15 PM) | |
| UA Ketones [Negative] | Negative (7/5/18 2:15 PM) | |
| UA Blood [Negative] | Negative (7/5/18 2:15 PM) | |
| UA Bili [Negative] | Negative (7/5/18 2:15 PM) | |
| UA Urobilinogen [Normal] | Normal (7/5/18 2:15 PM) | |
| UA Nitrite [Negative] | Negative (7/5/18 2:15 PM) | |
| UA Leuk Est [Negative] | Negative (7/5/18 2:15 PM) | |

## Immunizations

Given and Recorded

| Vaccine | Date | Status | Refusal Reason |
|---|---|---|---|
| influenza virus vaccine | 9/27/18 | Given | |
| influenza virus vaccine | 10/6/17 | Given | |
| pneumococcal 13-valent vaccine | 2/17/17 | Given | |
| diphtheria/pertussis, acel/tetanus adult1 | 9/28/09 | Recorded | |

1 Location History: KAISER-

## Procedures

| Procedure | Date | Related Diagnosis | Body Site | Status |
|---|---|---|---|---|
| ROUTINE VENIPUNCTURE | 7/5/18 | | | Completed |
| ROUTINE VENIPUNCTURE | 7/5/18 | | | Completed |

## Social History

| Most recent to oldest [Reference Range]: | 1 | 2 |
|---|---|---|
| Hct [43.5-53.7 %] | 38.8 % *LOW* (7/5/18 1:40 PM) | |
| MCV [80-97 um3] | 82 um3 (7/5/18 1:40 PM) | |
| MCH [27.0-31.2 uug] | 28.0 uug (7/5/18 1:40 PM) | |
| MCHC [31.8-35.4 Gm/dl] | 34.3 Gm/dl (7/5/18 1:40 PM) | |
| RDW [11.6-14.8 %] | 12.9 % (7/5/18 1:40 PM) | |
| Platelet Count [142-424 thousand/mm3] | 236 thousand/mm3 (7/5/18 1:40 PM) | |
| Neutro Auto [37.0-80.0 %] | 66.7 % (7/5/18 1:40 PM) | |
| Lymph Auto [10.0-50.0 %] | 22.3 % (7/5/18 1:40 PM) | |
| Mono Auto [0.0-12.0 %] | 7.6 % (7/5/18 1:40 PM) | |
| Eos Auto [0.0-7.0 %] | 2.6 % (7/5/18 1:40 PM) | |
| Basophil Auto [0.0-2.5 %] | 0.6 % (7/5/18 1:40 PM) | |
| Imm Gran Auto [0.0-1.0 %] | 0.2 % (7/5/18 1:40 PM) | |
| Abs Neutro Auto [1.70-7.00 x 10(9)/L] | 5.37 x 10(9)/L (7/5/18 1:40 PM) | |
| Abs Lymph Auto [0.90-2.90 x 10(9)/L] | 1.80 x 10(9)/L (7/5/18 1:40 PM) | |
| Abs Mono Auto [0.30-0.90 x 10(9)/L] | 0.61 x 10(9)/L (7/5/18 1:40 PM) | |
| Abs Eos Auto [0.05-0.50 x 10(9)/L] | 0.21 x 10(9)/L (7/5/18 1:40 PM) | |
| Abs Basophil Auto [0.00-0.30 x 10(9)/L] | 0.05 x 10(9)/L (7/5/18 1:40 PM) | |
| Abs Imm Gran Auto [0.00-0.08 x 10(9)/L] | <0.03 x 10(9)/L (7/5/18 1:40 PM) | |
| NRBC Auto | 0.0 /100 WBC *NA* (7/5/18 1:40 PM) | |
| Abs NRBC | <0.01 x 10(9)/L *NA* (7/5/18 1:40 PM) | |

Urine Studies

| Most recent to oldest [Reference Range]: | 1 | 2 |
|---|---|---|
| Sodium Level [136-145 mEq/L] | 135 mEq/L *LOW* (7/5/18 6:05 PM) | 130 mEq/L *LOW* (7/5/18 1:40 PM) |
| Potassium Level [3.5-5.1 mEq/L] | 4.3 mEq/L (7/5/18 6:05 PM) | 4.2 mEq/L (7/5/18 1:40 PM) |
| Chloride Level [98-107 mEq/L] | 102 mEq/L (7/5/18 6:05 PM) | 98 mEq/L (7/5/18 1:40 PM) |
| CO2 [21.0-32.0 mEq/L] | 22.5 mEq/L (7/5/18 6:05 PM) | 27.3 mEq/L (7/5/18 1:40 PM) |
| AGAP [5.0-15.0 mEq/L] | 10.5 mEq/L (7/5/18 6:05 PM) | 4.7 mEq/L *LOW* (7/5/18 1:40 PM) |
| Calcium [8.5-10.1 mg/dL] | 8.6 mg/dL (7/5/18 6:05 PM) | 9.2 mg/dL (7/5/18 1:40 PM) |
| Total Protein [6.4-8.2 Gm/dl] | 8.0 Gm/dl (7/5/18 1:40 PM) | |
| Albumin [3.4-5.0 Gm/dl] | 4.1 Gm/dl (7/5/18 1:40 PM) | |
| Glob [2.2-4.2 Gm/dl] | 3.9 Gm/dl (7/5/18 1:40 PM) | |
| A/G [1.2-2.2] | 1.1 *LOW* (7/5/18 1:40 PM) | |
| ALT [16-63] | 38 (7/5/18 1:40 PM) | |
| AST [15-37 IU/L] | 34 IU/L (7/5/18 1:40 PM) | |
| Alk Phos [46-116 IU/L] | 61 IU/L (7/5/18 1:40 PM) | |
| Bili Total [0.2-1.0 mg/dL] | 0.3 mg/dL (7/5/18 1:40 PM) | |
| Troponin [0.017-0.056 ng/mL] | <0.017 ng/mL *LOW* (7/5/18 1:40 PM) | |

Hematology

| Most recent to oldest [Reference Range]: | 1 | 2 |
|---|---|---|
| WBC [4.50-11.00 thousand/mm3] | 8.06 thousand/mm3 (7/5/18 1:40 PM) | |
| RBC [4.04-6.13 million/mm3] | 4.75 million/mm3 (7/5/18 1:40 PM) | |
| Hgb [14.1-18.1 Gm/dl] | 13.3 Gm/dl *LOW* (7/5/18 1:40 PM) | |

**sitagliptin (Januvia 100 mg oral tablet)**

1 tab(s) Oral DAILY for 90 Days. Refills: 2.

Ordering provider: Nguyen, Loc T., M.D.

**topiramate (topiramate 100 mg oral tablet)**

1 tab(s) Oral TWICE A DAY. Refills: 3.

Ordering provider: Jaber, James F., M.D.

**topiramate (topiramate 100 mg oral tablet)**

1 tab(s) Oral TWICE A DAY. Refills: 3.

Ordering provider: Nguyen, Loc T., M.D.

**triamcinolone topical (Kenalog 0.1% topical ointment)**

1 application(s) Topical 3 TIMES A DAY. Refills: 3.

Ordering provider: Nguyen, Loc T., M.D.

**triamcinolone topical (triamcinolone 0.5% topical ointment)**

1 application(s) Topical TWICE A DAY. apply a thin film to affected area on left abdomen,

total 7 days. Refills: 3.

Ordering provider: Nguyen, Loc T., M.D.

**venlafaxine (venlafaxine 150 mg oral capsule, extended release)**

1 cap Oral DAILY. take both 150-mg tablet and 75-mg tablet together (total 225mg) daily.

Refills: 3.

Ordering provider: Nguyen, Loc T., M.D.

**venlafaxine (venlafaxine 75 mg oral tablet, extended release)**

1 tab(s) Oral DAILY. Refills: 3.

Ordering provider: Nguyen, Loc T., M.D.

## Results

Chemistry

| Most recent to oldest [Reference Range]: | 1 | 2 |
| --- | --- | --- |
| Glucose Level [74-106 mg/dL] | 122 mg/dL<br>*HI*<br>(7/5/18 6:05 PM) | 91 mg/dL<br>(7/5/18 1:40 PM) |
| BUN [7-18 mg/dL] | 43 mg/dL<br>*HI*<br>(7/5/18 6:05 PM) | 43 mg/dL<br>*HI*<br>(7/5/18 1:40 PM) |
| Creatinine [0.70-1.30 mg/dL] | 2.50 mg/dL<br>*HI*<br>(7/5/18 6:05 PM) | 2.76 mg/dL<br>*HI*<br>(7/5/18 1:40 PM) |
| B/CR [12.0-20.0] | 17.2<br>(7/5/18 6:05 PM) | 15.6<br>(7/5/18 1:40 PM) |
| GFR African-AM | 34 mL/min/1.73m2<br>*NA*<br>(7/5/18 6:05 PM) | 30 mL/min/1.73m2<br>*NA*<br>(7/5/18 1:40 PM) |
| GFR-NonAfric-Am | 28 mL/min/1.73m2<br>*NA*<br>(7/5/18 6:05 PM) | 25 mL/min/1.73m2<br>*NA*<br>(7/5/18 1:40 PM) |

**aspirin (aspirin 81 mg)**

1 tab(s) Oral DAILY.

**cholecalciferol (Vitamin D3 2000 intl units oral tablet)**

1 tab(s) Oral DAILY. Refills: 11.

Ordering provider: Nguyen, Loc T., M.D.

**colchicine (colchicine 0.6 mg oral tablet)**

1 tab(s) Oral DAILY as needed for gout pain. Refills: 1.

Ordering provider: Nguyen, Loc M.D.

**cyanocobalamin (Vitamin B12 1000 mcg oral tablet)**

1 tab(s) Oral DAILY. Refills: 3.

Ordering provider: Nguyen, Loc T., M.D.

**cyclobenzaprine (cyclobenzaprine 10 mg oral tablet)**

1 tab(s) Oral TWICE A DAY as needed for spasm for 30 Days. Refills: 1.

Ordering provider: Jaber, James F., M.D.

**fenofibrate (fenofibrate 200 mg oral capsule)**

1 cap Oral DAILY for 90 Days. Refills: 3.

Ordering provider: Nguyen, Loc T., M.D.

**glipiZIDE (GlipiZIDE XL 10 mg oral tablet, extended release)**

1 tab(s) Oral TWICE A DAY for 30 Days. Refills: 5.

Ordering provider: Nguyen, Loc T., M.D.

**hydrochlorothiazide-lisinopril (hydrochlorothiazide-lisinopril 25 mg-20 mg oral tablet)**

1 tab(s) Oral DAILY. Refills: 3.

Ordering provider: Nguyen, Loc T., M.D.

**lidocaine topical (Lidoderm 5% topical film)**

1 patch(es) Topical DAILY. For severe right upper extremeity neuropathic pain. Patient
cannot tolerate Gabapentin. Refills: 6.

Ordering provider: Nguyen, Loc T., M.D.

**metFORMIN (metFORMIN 1000 mg oral tablet)**

1 tab(s) Oral TWICE A DAY. Refills: 6.

Ordering provider: Nguyen, Loc T., M.D.

**morphine (MS Contin 30 mg oral tablet, extended release)**

1 tab(s) Oral AT BEDTIME for 30 Days. m54.16. Refills: 0.

Ordering provider: Jaber, James F., M.D.

**morphine (MS Contin 30 mg oral tablet, extended release)**

1 tab(s) Oral AT BEDTIME for 30 Days. m54.16. Refills: 0.

Ordering provider: Jaber, James F., M.D.

**omeprazole (omeprazole 40 mg oral delayed release capsule)**

1 cap Oral TWICE A DAY. before a meal. Refills: 5.

Ordering provider: Hasan, Nazia, M.D.

**rosuvastatin (rosuvastatin 10 mg oral tablet)**

1 tab(s) Oral DAILY. Refills: 3.

Ordering provider: Nguyen, Loc T., M.D.

**rosuvastatin (rosuvastatin 10 mg oral tablet)**

1 tab(s) Oral DAILY for 90 Days. Refills: 1.

Ordering provider: Nguyen, Loc T., M.D.

| Condition | Effective Dates | Status | Health Status | Informant |
|---|---|---|---|---|
| Chronic fatigue(Confirmed) | | Active | | |
| Neck pain(Confirmed) | | Active | | |
| Lumbar radiculitis(Confirmed) | | Active | | |
| Obesity(Confirmed) | | Active | | |
| OSA on CPAP(Confirmed) | | Active | | |
| Osteoarthritis of knee(Confirmed) | | Active | | |
| Partial tear of left subscapularis tendon(Confirmed) | | Active | | |
| Encounter for screening colonoscopy(Confirmed) | | Active | | |
| Right shoulder pain(Confirmed) | | Active | | |
| Left shoulder pain(Confirmed) | | Active | | |
| Subacromial impingement(Confirmed) | | Active | | |
| Tear of left supraspinatus tendon(Confirmed) | | Active | | |
| Tear of right supraspinatus tendon(Confirmed) | | Active | | |
| Mid back pain(Confirmed) | | Active | | |
| Type 2 diabetes mellitus with hemoglobin A1c goal of less than 7.0% (Confirmed) | | Active | | |
| Need for vaccination for Strep pneumoniae(Confirmed) | | Active | | |
| Vitamin D deficiency(Confirmed) | | Active | | |

## Allergies, Adverse Reactions, Alerts

| Substance | Reaction | Severity | Status |
|---|---|---|---|
| Decadron | | | Active |

## Medications

| Condition | Effective Dates | Status | Health Status | Informant |
|---|---|---|---|---|
| Pain of both hip joints(Confirmed) | | Active | | |
| Bilateral chronic knee pain(Confirmed) | | Active | | |
| Arthritis(Confirmed) | | Active | | |
| Morbid obesity with BMI of 40.0-44.9, adult(Confirmed) | | Active | | |
| Brachial plexopathy(Confirmed) | | Active | | |
| Chronic depression(Confirmed) | | Active | | |
| CKD (chronic kidney disease), stage III(Confirmed) | | Active | | |
| Chronic pain(Confirmed) | | Active | | |
| Vitamin B12 deficiency(Confirmed) | | Active | | |
| DJD of left AC joint(Confirmed) | | Active | | |
| Depression(Confirmed) | | Active | | |
| Chronic patellofemoral pain of both knees(Confirmed) | | Active | | |
| Dyslipidemia(Confirmed) | | Active | | |
| DOE (dyspnea on exertion)(Confirmed) | | Active | | |
| Edema of lower extremity(Confirmed) | | Active | | |
| Essential hypertension(Confirmed) | | Active | | |
| Fall(Confirmed) | | Active | | |
| Stress(Confirmed) | | Active | | |
| Headache(Confirmed) | | Active | | |
| History of smoking for 2-5 years(Confirmed) | | Active | | |
| Hyperlipidemia LDL goal <100(Confirmed) | | Active | | |
| Legal circumstances(Confirmed) | | Active | | |
| Chronic radicular pain of lower back(Confirmed) | | Active | | |
| Morbid obesity(Confirmed) | | Active | | |

## Encounter

**FIN 13192499 Date(s): 7/5/18 - 7/5/18**

NorthBay Medical Center 1200 B. Gale Wilson Blvd. Fairfield, CA 94533 US (707) 646-5000

**Encounter Diagnosis**

Dehydration (Discharge Diagnosis) - 7/5/18

AKI (acute kidney injury) (Discharge Diagnosis) - 7/5/18

Shoulder pain (Discharge Diagnosis) - 7/5/18

Dehydration (Final) -

Acute kidney failure, unspecified (Final) -

Disorientation, unspecified (Final) -

Slurred speech (Final) -

Pain in right shoulder (Final) -

Cervicalgia (Final) -

Other fall on same level, initial encounter (Final) -

Cell of prison as the place of occurrence of the external cause (Final) -

Essential (primary) hypertension (Final) -

Hyperlipidemia, unspecified (Final) -

Type 2 diabetes mellitus without complications (Final) -

Obstructive sleep apnea (adult) (pediatric) (Final) -

Other chronic pain (Final) -

Discharge Disposition: Home For Self-Care

Attending Physician: Garcia, Steven M., M.D.

## Vital Signs

| Most recent to oldest [Reference Range]: | 1 | 2 | 3 |
|---|---|---|---|
| Temperature [96.5-101.5 DegF] | 97.7 DegF (7/5/18 6:52 PM) | 97.8 DegF (7/5/18 3:25 PM) | 97.5 DegF (7/5/18 1:06 PM) |
| Heart Rate [50-200 bpm] | 83 bpm (7/5/18 6:52 PM) | 81 bpm (7/5/18 4:58 PM) | 79 bpm (7/5/18 3:25 PM) |
| Respiratory Rate [8-30 br/min] | 18 br/min (7/5/18 6:52 PM) | 16 br/min (7/5/18 4:58 PM) | 18 br/min (7/5/18 3:25 PM) |
| Blood Pressure [75-150/40-90 mmHg] | 100/59 mmHg (7/5/18 6:52 PM) | 104/63 mmHg (7/5/18 4:58 PM) | 98/62 mmHg (7/5/18 3:25 PM) |
| Mean Arterial Pressure [40-140 mmHg] | 77 mmHg (7/5/18 4:58 PM) | 72 mmHg (7/5/18 3:25 PM) | 68 mmHg (7/5/18 2:07 PM) |
| Blood Pressure Via | Auto (7/5/18 1:06 PM) | | |

## Problem List

| Condition | Effective Dates | Status | Health Status | Informant |
|---|---|---|---|---|
| Acute Hyperglycemia(Confirmed) | | Active | | |

## Primary Encounter

### Encounter Information

Registration Date: 07/5/2018

Discharge Date: 07/5/2018

Visit ID: --

### Location Information

NorthBay Hospital Campus

Work: 1200 B. Gale Wilson Blvd. Fairfield, CA 94533, US

### Providers

| Type | Name | Address | Phone |
|------|------|---------|-------|
| Attending | Garcia, Steven M. | Work: NBMC, Emergency Department 1200 B. Gale Wilson Blvd. Ph. (707) 646-5800 Fairfield, CA 94533, US | Work Tel: (707) 646-5800 |

**GARCIA, PERFECTO BAUER**   Sex: **M**   DOB: **02/18/1959**

**Ambulatory Summary**

Summarization of Episode Note | 07/5/2018 to 07/5/2018

Source: NorthBay Medical Center

Created: 12/31/2018

## Demographics

Contact Information:

2006 SWAN WAYFAIRFIELD, CA 94533, US

Tel: (707)280-4047

Mail: PBG1959@OUTLOOK.COM

Mail: PBG1959@OUTLOOK.COM

Marital Status: Single

Religion: Roman Catholic

Race: White, White

**Previous Name(s):** --

Ethnic Group: Hispanic or Latino

Language: eng

IDs: 533830

### Care Team

| Type | Name | Represented Organization | Address | Phone |
|------|------|--------------------------|---------|-------|
| primary care physician | Nguyen, Loc T. | -- | Work:NorthBay Transition of Care Clinic1860 Pennsylvania Ave, Suite 320Fairfield, CA 94533, US | Work Tel: (707)646-4415 |

### Relationships

No Data to Display

## Document Details

### Source Contact Info

1200 B Gale Wilson BlvdFairfield, CA 94533, US

Tel: (707)646-5000

### Author Contact Info

--

### Recipient Contact Info

--

### Healthcare Professionals

No Data to Display

### IDs & Code Type Data

Document Type ID: 2.16.840.1.113883.1.3 : POCD_HD000040

Document Template ID: 2.16.840.1.113883.10.20.22.1.1 : --, 2.16.840.1.113883.10.20.22.1.2 : --

Document ID: 2.16.840.1.113883.3.1046.999362 : 886763

Document Type Code: 2.16.840.1.113883.6.1, 34133-9

Document Language Code: en-US

Document Set ID: --

Document Version Number: --

**CENTER** *for*
**SPECIAL CARE**
*A North...*

1860 Pennsylvania Ave., #200
Fairfield, CA 94533
Phone (707) 646-4180
Fax (707) 646-4185

MRN: 00533830        05/09/2018
GARCIA, PERFECTO B
02/18/1959  59Y  M

Patient Name:   DOYLE , DONALD         Date: _____
             Clinic   FIN: 0013047958
Address: _____   Mcare Part A & B

| GENERIC EQUIVALENT MUST BE DISPENSED UNLESS OTHERWISE INDICATED | QUANTITY | REFILLS |
|---|---|---|
| R  MEDICATION   STRENGTH CONCENTRATION   DOSAGE FORM   To whom it may concern, | | |
| Sig  Mr Perfecto Garcia has | | |
| R  severe sleep apnea. This | | |
| Sig  requires the use of a CPAP | | |
| R  device every night! | | |
| Sig | | |

Signature: _____        No Substitutions ☐

Donald Doyle, M.D., F.C.C.P.  CA Lic # A42131   DEA # BD1103314

EXHIBIT K

1 THE NAPA COUNTY COURTS

2 COUNTY OF NAPA, STATE OF CALIFORNIA

3 Honorable MARK BOESSENECKER, Presiding

4 -oOo-

5

6 THE PEOPLE OF THE STATE OF CALIFORNIA, )  **CERTIFIED COPY**

               )

          Plaintiff, )

7              )

        vs.     ) No. CR183040

8              )

 PERFECTO GARCIA,       )

9              )

        Defendant. )

10             )

             )

11

12 REPORTER'S TRANSCRIPT OF PROCEEDINGS

13 VIOLATION OF PROBATION SENTENCING, REVIEW HEARING

14 MAY 30, 2018

15 -oOo-

16

17 APPEARANCES:

18

19 For the People:     MS. MONICA MUELLER
             Deputy District Attorney
20           931 Parkway Mall
             Napa, California
21           94559

22

 For the Defendant:    MR. ANDREW HIGGINS
23           Deputy Public Defender
             1127 First Street
24           Suite 265
             Napa, California
25            94559

26

         -oOo-
7     ELLE HEFLEY, CSR #7924
     Certified Shorthand Reporter
28        -oOo-

INDEX

WITNESSES IN CHRONOLOGICAL ORDER

PAGE

FOR THE PEOPLE:

NONE


FOR THE DEFENSE:

NONE

PEOPLE'S EXHIBITS

| NO. | Description | ID | EVD |
|-----|-------------|----|----|
| NONE | | | |

DEFENSE'S EXHIBITS

| NO. | Description | ID | EVD |
|-----|-------------|----|----|
| NONE | | | |

1                          -oOo-

2          The Testimony in the above-entitled matter came on

3    regularly this day in the Superior Courts of California, County

4    of Napa, before the Honorable MARK BOESSENECKER, Presiding.

5          THE PEOPLE OF THE STATE OF CALIFORNIA were represented

6    by MS. MONICA MUELLER, Deputy District Attorney for the Napa

7    County District Attorney's Office.

8          The Defendant, PERFECTO GARCIA, was present and in

9    attendance, and was attended and represented by, MR. ANDREW

10   HIGGINS, Deputy Public Defender for the Napa County Public

11   Defender's Office.

12         ELLE HEFLEY, Certified Shorthand Reporter, was present

13   and acting.

14         The following proceedings were had and taken:

15                         -oOo-

16                       PROCEEDINGS

17     THE BAILIFF:  Perfecto Garcia.

18     MS. MUELLER:  Monica Mueller for the People.

19     (Discussion off the record.)

20     MR. HIGGINS:  Mr. Higgins is here with Mr. Garcia.

21     THE COURT:  Alright.  So, the matter is on for sentencing,

22   which was an admission to a probation violation petition.

23     I have read and considered the Probation Officer's report.

24     Is formal arraignment for judgement waived and there is no

25   legal cause?

26     MR. HIGGINS:  Yes.

27     THE COURT:  And Ms. Mueller, what are your comments?

28     MS. MUELLER:  First, your Honor, the victim is here and

1   would like to make a statement to the Court.

2          THE COURT:  Okay.  Let's have him come forward.

3          MR. HIGGINS:  He sure can.

4          THE COURT:  Good morning.

5          MR. HANSON:  Good morning.

6          THE COURT:  If you could state your name for the record and

7   spell your last name?

8          MR. HANSON:  Darrel Hanson, H-A-N-S-O-N.

9          THE COURT:  Alright.  Go ahead, sir.

10         MR. HANSON:  I'm just hoping the harassment will end from

11  Mr. Garcia.  I have been being harassed for over 20 years.

12         And after this incident I've not felt that he's shown any

13  remorse from his actions that he's taken against me.  After

14  being ran over in the driveway, i was handed a ten million

15  dollar lawsuit, which I've had to defend myself from.

16         And then after his sentencing, and he was supposed to spend

17  90 days in jail, he was let out of jail early.  And he

18  immediately posted videos on the internet violating his

19  probation.

20         I currently have over 33 videos of me living my life,

21  walking the dog, washing cars on the internet, and I'm just

22  hoping that this can end.

23         And that if whatever he's sentenced to that he spends the

24  full time in jail or whatever that happens to be.  And that this

25  harassment can stop from Mr. Garcia.

26         THE COURT:  Thank you, Mr. Hanson.  Thank you for coming to

27  court.

28         MR. HANSON:  Thank you.

4

1      MS. MUELLER:   Your Honor, I also noticed in Mr. Garcia's

2   statement that he does, as Probation noted, justify his actions

3   and excuses them as part of what appears to be an ongoing

4   dispute which does concern the People.

5      But I do think anger management might be the most effective

6   way to end this pattern.

7      So, I agree with Probation's recommendation.   But I would

8   note that I believe he's already been ordered to anger

9   management after the initial conviction.   But I believe that has

10   been stayed to some extent due to pending further legal matters.

11      THE COURT:   Mr. Higgins.

12      MR. HIGGINS:   So, I'm a little -- I'm a little confused by

13   the statement the victim just made in that the information that

14   I have is that there were four videos on U-Tube.

15      Mr. Garcia and I had a talk, and it stopped that day.   And

16   there hasn't been a hint of that since the last three months.

17      And the positive is that there has been no -- in contact,

18   there have been no in contact issues, no other issues other than

19   Mr. Garcia doing this.

20      And I think the important part of this to me was that --

21   let me find the exact -- he makes a statement to Probation

22   admitting that what he did was wrong.

23      And I think that we've all been with Mr. Garcia quite a bit

24   in court together.   That's a big step for him.   And I think

25   that's a positive.   And I think it's a positive that there --

26   and again I don't know where this information comes from, I

'7   think it's false to say that there are multiple videos on-line

28   at the moment that have anything to do with Mr. Garcia.

1    I think Probation has verified what I checked that whatever
2  was up is gone and off.  And I think the lesson here has been
3  learned.  And I think it's important to get this counseling
4  going.

5    And I agree and appreciate Probation's thoughtfulness in
6  this.

7    And I think Mr. Garcia is making positive steps by
8  acknowledging what he did was wrong.  And it's not going to be
9  an overnight complete correction, but he's on the correct path.

10    And my hope is the Court will follow the recommendation and
11 that with counseling he will continue along that path.

12    THE COURT:  I'm not going to follow the recommendation.

13    I am repeatedly flabbergasted at Mr. Garcia's inability to
14 comprehend the impact he is having on another person and his
15 continued justification of his conduct, that as we heard during
16 the trial, has been going on for years.

17    And to think that he was convicted by a jury of a felony
18 offense.  I placed him on probation.  I stayed his jail sentence
19 by the way pending appeal, and I can always lift that stay.  And
20 then he goes out within days and does the same kind of conduct.
21 And to think that somehow I'm not going to -- a Court is not
22 going to impose a jail sentence as a result of that?  I
23 certainly am.

24    I'm not going to stay anger management.  He's supposed to
25 do anger management.  I ordered that in November.

26    So, he's going to do a jail sentence because it clearly
7  it's not getting through to him.

28    And clearly what you see in the report is a demonstration

1   of that complete unwillingness to just leave this person alone.

2       MR. HIGGINS:  So, what I do have is new information for me

3   that I don't think I shared with the District Attorney, or I

4   think I did.

5       MS. MUELLER:  You showed me.

6       MR. HIGGINS:  And I can show the Court.

7       The issue we have is a medical concern in that the

8   physician's -- okay if I showed this to the Court?  His

9   physician indicates that it's a necessity for him to have a

10  breathing apparatus at night that I'm told the Jail does not

11  accommodate.  And that's the medical issue that we have.

12      THE COURT:  Well, he's going to need to sign a waiver for

13  the Probation Officer, so the Probation Officer can follow-up on

14  this.  So, I'm not going to accept it at face value.

15      MR. HIGGINS:  Okay.

16      Is that okay?

17      MR. GARCIA:  Uh-huh (affirmative).

18      THE COURT:  Any further comments?

19      MR. HIGGINS:  No, sir.

20      MS. MUELLER:  No.

21      THE COURT:  So, what I'm going to do is I'm going to revoke

22  and reinstate probation.  I'm going to impose the 30 days in the

23  County Jail.  I'll give him two weeks to surrender.

24      He can fill out a waiver for Probation so they can talk to

25  the doctor.  And he can check in with the Jail and find out what

26  they can accommodate.

27      I don't know whether they would have him do the time either

28  inside the jail or some kind of light duty outside the jail.  He

1   can go through that process.

2       But you can start going through this process.

3       And he's going to start going through these probation

4   conditions because it's just very obvious that he's not getting

5   what this whole process has meant over the past six months.

6       So, probation is revoked and reinstated under the same

7   terms and conditions.

8       Mr. Garcia, you are ordered to serve 30 days in the County

9   Jail on this violation.  It's a day-for-day case.

10      I'll give you four weeks to surrender.  That will be June

11  the 27th at 8:00 a.m.

12      You can contact the Jail before then in order to set up

13  your time that you are going to serve.

14      And attorney's fees are $250 and waived.

15      MR. HIGGINS:  So, your Honor, I do -- the original

16  probation report suggested that he has 21 days and credit.

17      THE COURT:  No.  He's to serve 30 on this violation.  He

18  has zero credits.

19      MR. HIGGINS:  Okay.  Thank you.

20      THE COURT:  Thank you.

21      MR. HIGGINS:  There will be paperwork forthcoming, sir?

22      THE COURT:  There will.

23      Oh, we have to set a review date for review on appeal.

24      How about -- I think I -- what I observed was that the

25  brief, appellant's brief is being put out in June.

26      So, what if we go out four months to -- actually let's go

27  to the beginning of September.  How about September, Friday,

28  September 7th at 8:30 in Department G?

1          MR. HIGGINS:   Sure.

2          THE COURT:   September 7th, 8:30, this Department,

3     Department G for status on appeal.

4          MR. HIGGINS:   Thank you.

5          THE COURT:   Thank you.

6          PROBATION OFFICER:   Your Honor, if there is an issue with

7     the Jail being able to accommodate the breathing mask matter --

8          THE COURT:   You can place the matter back on calendar.

9          PROBATION OFFICER:   Thank you.

10          THE COURT:   Thank you.

11

12

13

14          (Whereupon the proceedings concluded.)

15

16          (Proceedings consist of pages 1-10.)

17

18

19

20

21

22

23

24

25

26

7

28

-oOo-

## CERTIFICATE OF CERTIFIED SHORTHAND REPORTER

State of California )
                    )
County of Napa      )


     I, Elle S. Hefley, Certified Shorthand Reporter, hereby certify:

     That I am a Certified Shorthand Reporter duly licensed so to practice by the Department of Consumer Affairs, Certified Shorthand Reporter's Board of the State of California.

     That on May 30, 2018, I reported in stenographic writing the proceedings had in the matter of PERFECTO GARCIA, No. CR183040, in the Napa County Court Judicial District, County of Napa, State of California, before Honorable, MARK BOESSENECKER, Presiding.

     That I thereafter caused my said stenographic writing to be transcribed into typewriting.

     That the foregoing 9 pages constitute and are a full, true, accurate and correct transcription of my said stenographic writing and a correct and verbatim record of the proceedings to the best of my ability, as aforesaid at said time and place.


ELLE S. HEFLEY
Certified Shorthand Reporter
CSR License No. 7924

MAY 0 9 2005

**NAPA COUNTY**
**CRIMINAL JUSTICE SYSTEM**
**ARREST/DETENTION/COMPLAINT FORM**

PAGE 1 OF 1

| ARRESTING AGENCY | NCIC # | | AGENCY CASE # | PID # |
|---|---|---|---|---|
| | | | 05-4043 | |

| TYPE OF ARREST | | | | |
|---|---|---|---|---|
| ☐ ON VIEW ☒ ADULT | ☒ REQUEST FOR COMPLAINT & WARRANT (NOT IN CUSTODY) | ☐ DETENTION ONLY RELEASED, PC 849(b)) | ☐ DOMESTIC VIOLENCE ☐ WEAPONS USED | |
| ☐ CITIZENS ARREST ☐ JUVENILE | DATE OF OFFENSE 4-18-05 | A0758233.23 | ☐ NARCOTICS OFFENSE | |
| ☐ WARRANT ARREST | | | | |

| SUSPECT NAME (FIRST, MIDDLE, LAST) | AKA | DL # STATE | DOB 2-18 |
|---|---|---|---|
| PERFECTO GARCIA | | SS # | RACE H SEX M |

| HOME ADDRESS (STREET, CITY, COUNTY, STATE, ZIP) | BUSINESS/SCHOOL NAME | HT 5'11" WT 240 |
|---|---|---|
| 563 MONROE ST., NAPA CA 94558 | | HAIR BRO EYE BRO |

| HOME PHONE | YEAR | COLOR | SUSPECT'S CAR | TYPE | STYLE | VEHICLE LOCATION |
|---|---|---|---|---|---|---|
| 707 208 | | | | | | |
| WORK PHONE | MAKE | MODEL | LIC # | | STATE | HOLD? ☐ YES ☐ NO |

| NAME (PARENT/GUARDIAN, IF JUVENILE) | RELATIONSHIP | EMERGENCY NOTIFICATION (MUST BE COMPLETED IF JUVENILE) | NOTIFIED BY | DATE/TIME |
|---|---|---|---|---|

| ADDRESS | | | | |
|---|---|---|---|---|
| LOCATION OF ARREST | | ARREST DATE/TIME | BOOKING DATE/TIME | ☐ JAIL ☐ JUV. HALL |

| ARRESTING OFFICER | ID # | TRANSPORTING OFFICER | ID # | RECEIVING OFFICER | ID # |
|---|---|---|---|---|---|

**CHARGES**

| F/M/I | CODE | SECTION | OFFENSE DESCRIPTION | WARRANT/EVENT # | COURT | BAIL AMT |
|---|---|---|---|---|---|---|
| M | PC | 166.4 | VIOLATION OF COURT ORDER | | NAPA | |

| WARRANT CHECK | HOLDS? | CONFIRMED BY | CUSTODY ALERT | | |
|---|---|---|---|---|---|
| ☐ LOCAL | ☐ YES | | ☐ PROTECTIVE CUSTODY | ☐ ESCAPE RISK | ☐ MEDICAL RISK (EXPLAIN): |
| ☐ DMV | ☐ NO | | ☐ ASSAULT/COMBATIVE | ☐ SUICIDE RISK | |
| ☐ DOJ/NCIC | | | ☐ KEEP SEPARATE FROM (NAME) | | |

| EVIDENCE/COMPLAINT OF ILLNESS/INJURY: | YES | NO | TREATED BY: | DATE/TIME | CVS |
|---|---|---|---|---|---|

| FELONY ARREST | BOOKING AUTHORITY | COPIES TO: |
|---|---|---|

MISDEMEANOR ARRESTS - CHECK ONE OR MORE BELOW
PC 853.6 CITATION RELEASE EXCEPTIONS

DA MAY 1 0 2005

☐ Intoxicated state may result in danger to self or others
☐ Arrestee required medical exam or care or could not care for own safety
☐ The immediate release would jeopardize prosecution
☐ Arrested for one or more offenses listed under VC 40302/40303
☐ Demanded immediate appearance or refused to sign written promise to appear
☐ Imminent danger safety of other persons or property
PC 847(G) EXCEPTIONS
☐ Under the influence of any drug or under the combined influence of any drug and alcohol
☐ Probable cause to believe arrestee has committed a felony, or misdemeanor other than PC 847(f)
☐ Good faith belief arrestee will attempt escape or is unreasonably difficult for medical personnel to control

☐ Arrested for VC 23152(a) or VC 23152(b)
☐ There are additional outstanding arrest warrants
☐ Arrestee had no personal identification
☐ Release would increase likelihood of offense continuing
☐ WIC 625
☐ Reason to believe arrestee would fail to appear (state reason):

☐ ADULT PROBATION
☐ JUVENILE PROBATION
☐ NSIB
☐ DETECTIVES
☐ STATE PAROLE
☐ CYA
☐ ADMINISTRATION
☐ OTHER

**NARRATIVE**                    ☐ CONTINUATION PAGE ATTACHED

DESCRIBE PROBABLE CAUSE FOR ARREST/DETENTION OR CIRCUMSTANCES LEADING TO WARRANT ARREST (DO NOT USE CONTINUATION PAGE UNLESS ABSOLUTELY NECESSARY

ON 4-18-05 THE VICTIM REPORTED THAT PERFECTO GARCIA PLACED A CAR WITH A CAMERA NEAR THE VICTIM'S HOUSE. THE CAMERA IN THE CAR WAS POINTED TOWARDS THE VICTIM'S RESIDENCE. THE VICTIM HAS A VALID RESTRAINING ORDER, RESTRAINING GARCIA, WITH TERMS THAT PROHIBIT HARASSING OR KEEPING UNDER SURVEILLANCE. GARCIA ADMITTED THE CAR AND CAMERA WERE HIS. HE CONSIDERS THE CAMERA TO BE A "WITNESS".

I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE STATE OF CALIFORNIA AND UPON INFORMATION AND BELIEF, THAT THE FOREGOING IS TRUE AND CORRECT.

| OFFICER'S SIGNATURE | OFFICER'S NAME (Print): ESSER | ID # 71 | DATE 5-9-05 |
|---|---|---|---|
| REVIEWED BY (Signature) | REVIEWED BY (Print): C#38 | ID # | DATE 5-9-05 |

EXHIBIT H

CERTIFIED COPY

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF NAPA
## MINUTE ORDER

Page 2 of 2

| | |
|---|---|
| **Case:** People vs. Garcia, Perfecto (M)<br>**Judge:** Rodney Stone<br>**Courtroom:** Department D<br>**Event:** Conference: Settlement<br>**PID # :** 200501404-01 | **Case #** CR128258<br>**Event Date:** May 16, 2006<br>**Clerk:** M. Dombach<br>**Reporter:** Electronic Reporting<br>**Cite/Report #:** 05-4043 |

**Appearances:**
M. Mautner, Deputy District Attorney
S. Ramsey, Deputy Public Defender
Defendant is present

The Public Defender declares a conflict of interest and is relieved.

| PLEA |
|---|

☒      Case dismissed upon motion of the District Attorney based on insufficient evidence.

Further orders: No attorney fees assessed for this matter.

-oOo-

I hereby certify the document herein
to be a true and correct copy of the
original on file with this court.

MAY 1 6 2006

Dated: _____

Clerk of the Napa Superior Court

BY: _____

JUL 0 9 2002

# NAPA POLICE DEPARTMENT

1539 First Street Napa, California 94559
(707) 257-9223 CA0280200

| | | | |
|---|---|---|---|
| DATE AND TIME REPORTED TO POLICE DEPARTMENT: 7/4/02 2112 | DVR ☐ DEATH ☐ | M/P ☐ R/A ☐ | CR NUMBER: 02-6711 PAGE 1 OF |

## Incident Desc.

| | | |
|---|---|---|
| CODE SECTION: 245 P.C. | CRIME: ASSAULT / DEADLY WEAPON | CLASSIFICATION: |
| DATE OCCURRED: 7/4/02 TIME: 2045 | LOCATION: MONROE ST / LAUREL ST | |
| TO DATE: 7/4/02 TIME: 2045 | DAY(S) OCCURRED: THURSDAY | [x] FELONY ☐ MISDEMEANOR · BEAT: 1 · RD: · CLASS CODE: |

## Involved Persons

**1** VICTIM OR FIRM NAME (LAST, FIRST, MIDDLE): GARCIA RUDOLPH YOVALE — DOB: [redacted]
RESIDENCE ADDRESS: 563 MONROE ST — RESIDENCE PHONE: [redacted] — BUSINESS PHONE: —
BUSINESS ADDRESS OR EMPLOYER: —

| RACE | SEX | HAIR | EYES | HEIGHT | WEIGHT | DRIVERS LICENSE NO. | ST |
|---|---|---|---|---|---|---|---|
| H | M | BRN | BRN | 6'0" | 240 | | |

**2** V RP (W) PI — NAME (LAST, FIRST, MIDDLE): GARCIA PERFECTO BAUER — DOB: [redacted]
RESIDENCE ADDRESS: 563 MONROE ST. — RESIDENCE PHONE: [redacted] — BUSINESS PHONE: —
BUSINESS ADDRESS OR EMPLOYER: —

| RACE | SEX | HAIR | EYES | HEIGHT | WEIGHT | DRIVERS LICENSE NO. | ST |
|---|---|---|---|---|---|---|---|
| H | M | BRN | BRN | 6'2 | 220 | [redacted] | |

**3** V RP W PI — NAME (LAST, FIRST, MIDDLE): — DOB:
RESIDENCE ADDRESS: — RESIDENCE PHONE: — BUSINESS PHONE:
BUSINESS ADDRESS OR EMPLOYER: — RACE — SEX — HAIR — EYES — HEIGHT — WEIGHT — DRIVERS LICENSE NO. — ST

VIC VEH: LICENSE NUMBER — STATE — YEAR — MAKE — MODEL — STYLE — COLOR/COLOR

CONTROLLED DOCUMENT

CONFIDENTIAL INFORMATION
DUPLICATION OR REISSUANCE CONTROLLED BY LAW
TO: R. GARCIA
BY: DC
DATE: 01-29-02
NAPA POLICE

## PRELIMINARY INVESTIGATION

[x] AREA CHECKED ☐ DUSTED FOR — VICTIM/WITNESS CONTACTED — NEIGHBORS CONTACTED — ☐ SCENE DIAGRAMMED ☐ SCENE PHOTOGRAPHED — ☐ TIRE/SHOE TRACKS ☐ DET NOTIFIED, WHO?

## MO FACTORS

**SURROUNDING AREA:** ☐ A Commercial/Industrial ☐ B Construction site ☐ C Park ☐ D Parking Garage ☐ E Parking Lot ☐ F Recreational ☐ G Residential ☐ H Rural ☐ I School ground ☐ J Shopping Cntr/business ☐ K Street/Alley ☐ Z

**STRUCTURE — RESIDENTIAL:** ☐ 1 Apartment ☐ 2 Condominium ☐ 3 Duplex/Triplex ☐ 4 Mobile Home [x] 5 Single Family ☐ 6 Town house ☐ 98

**COMMERCIAL:** ☐ 10 Bank/Financial ☐ 11 Bar ☐ 12 Business Office ☐ 13 City Building ☐ 14 County Building ☐ 15 Entertain/Recreation ☐ 16 Fast Food ☐ 17 Gas Station ☐ 18 Hotel/Motel/B&B ☐ 19 Indus/MFG/Whse ☐ 20 Jewelry/Coin/Pawn ☐ 21 Liquor Store ☐ 22 Market ☐ 23 Mini Mart ☐ 24 Mini Storage ☐ 25 Out Buildings ☐ 26 Pharm/Medical/Dental ☐ 27 Public Building ☐ 28 Restaurant ☐ 29 Retail Store ☐ 30 School ☐ 31 Vehicle/Boat ☐ 99

**TARGET:** ☐ 1 Attic ☐ 2 Automated Teller ☐ 3 Basement ☐ 4 Bathroom ☐ 5 Bedroom ☐ 6 Cash Register/Drawer ☐ 7 Classrm Equip/supplies ☐ 8 Cash Register ☐ 9 Coin Op Machine ☐ 10 Customer ☐ 11 Dining Room ☐ 12 Display Items ☐ 13 Family Room ☐ 14 Garage/Carport ☐ 15 Kitchen ☐ 16 Laundry Room ☐ 17 Livestock/Pets ☐ 18 Living Room ☐ 19 Office Equip/Supplies ☐ 20 Owner/Employee ☐ 21 Pedestrian ☐ 22 Safe/Box ☐ 23 Sales Area ☐ 24 Storage/Shed ☐ 25 Vehicle/Boat ☐ 26 Vending/Machine ☐ 27 Video Game ☐ 99

**POINT OF ENTRY:** ☐ 1 Unknown ☐ 2 Front ☐ 3 Rear ☐ 4 Side ☐ 5 Ground level ☐ 6 Upper level ☐ 7 Adjacent Building ☐ 8 Basement ☐ 9 Door ☐ 10 Duct/Vent ☐ 11 Floor ☐ 12 Garage ☐ 13 Louver ☐ 14 Pet Door ☐ 15 Roof ☐ 16 Sliding Glass Door ☐ 17 Wall ☐ 18 Window ☐ 98

**VEHICLE ONLY:** ☐ 25 Drivers Side ☐ 26 Passenger Side ☐ 27 Convertible ☐ 28 Camper ☐ 29 Door ☐ 30 Hood ☐ 31 Sunroof ☐ 32 Trunk ☐ 33 ☐ 34 Window ☐ 99

**POINT OF EXIT**

**METHOD OF ENTRY:** ☐ 0 Unknown ☐ 1 Attempt Only ☐ 2 Bodily Force ☐ 3 Hid in Building ☐ 4 Kicked ☐ 5 Knob Twist ☐ 6 Lock Box ☐ 7 Lock Cut/Broken ☐ 8 Lock Picked ☐ 9 Lock Punched ☐ 10 Lock Slipped/Key ☐ 11 Open for Business ☐ 12 Pried ☐ 13 Removed ☐ 14 Smashed ☐ 15 Tunneled ☐ 16 Unlocked/No Force ☐ 98

**TOOLS USED:** ☐ 20 Unknown ☐ 21 Bolt Cutter ☐ 22 Brick/Rock ☐ 23 Channel Lock/Pliers ☐ 24 Drill ☐ 25 Flashlight ☐ 26 Glass Cutter ☐ 27 Hammer ☐ 28 Hanger/Slip device ☐ 29 Key/Combination ☐ 30 Pipe Wrench ☐ 31 Pry Tool/Bar ☐ 32 Saw/Cutting Tool ☐ 33 Screwdriver ☐ 34 Slim Jim ☐ 35 Tape/Wire ☐ 36 Tire Iron ☐ 37 Vice Grips ☐ 99

**SECURITY SYSTEM:** ☐ 1 Audible ☐ 2 Cameras ☐ 3 Dog ☐ 4 Fence/Bars ☐ 5 Guard Service ☐ 6 Neighborhood Watch ☐ 7 Operation ID ☐ 8 Outside Lighting ☐ 9 Security Sign/Sticker ☐ 10 Silent Alarm ☐ 11 Standard Locks ☐ 12 Window Bars ☐ 99

**SUSPECT ACTIONS:** ☐ 0 No Loss ☐ 1 Alarm Disabled ☐ 2 Alcohol on Breath ☐ 3 Ate/Drank on premises ☐ 4 Cased Location ☐ 5 Cash Demanded ☐ 6 Cat Burglar ☐ 7 Climaxes ☐ 8 Defecated ☐ 9 Demand Note Used ☐ 10 Exit Prepared ☐ 11 Fired Weapon ☐ 12 Followed/Stalked Vctm ☐ 13 Forced Veh Off Road ☐ 14 Gloves Worn ☐ 15 Hid in Bushes ☐ 16 Knew Loc Hidden $$$ ☐ 17 Lookout Used ☐ 18 Mask Worn/Hid Face ☐ 19 Matches Used F/Light ☐ 20 Masturbated ☐ 21 Multiple Suspects ☐ 22 Offered: ☐ 96 ☐ 23 Phone Disabled ☐ 24 Pillowcs Taken/Used ☐ 25 Power Disabled ☐ 26 Ransacked ☐ 27 Selective in Loot ☐ 28 Smoked on Premises ☐ 29 U.I.D. ☐ 30 Vandalized ☐ 31 Veh Demanded/Stolen ☐ 32 Veh Req Remove Property ☐ 33 Vict's Clothes Cut/Ripped ☐ 34 Victim's Name Used ☐ 35 Victim's Tools Used ☐ 36 Withdrew Before Climax ☐ 37 Wore Costume/Uniform

**TOOK ONLY:** ☐ 38 Concealables ☐ 39 Jewelry ☐ 40 Money ☐ 41 TV/Stereo ☐ 97

**PRETENDED TO BE:** ☐ 50 Delivery Person ☐ 51 Disabled Motorist ☐ 52 Need/Wanted Phone/Bthrm ☐ 53 Lending Assistance ☐ 54 Person Finding Money ☐ 55 Police/Law ☐ 56 Repair Person ☐ 57 Seeking Assistance ☐ 58 Seeking Employment ☐ 98

**VICTIM WAS:** ☐ 60 Blindfolded ☐ 61 Bound/Gagged ☐ 62 Disrobed By Suspect ☐ 63 Forced to Cover Face ☐ 64 Forced to Disrobe ☐ 65 Forced to Fondle Suspect ☐ 66 Forced to Lie on Floor ☐ 67 Forced to Masturbate Susp ☐ 68 Forced to Move ☐ 69 Forced to rear of store ☐ 70 Handcuffed ☐ 71 Injured/Hit ☐ 72 Kidnapped ☐ 73 Locked In ☐ 74 Made to Count ☐ 75 Molested ☐ 76 Orally Copulated ☐ 77 Other Sex Acts ☐ 78 Raped With Object ☐ 79 Raped More Than Once ☐ 80 Sodomized ☐ 81 Threatened ☐ 82 Tortured ☐ 83 Tourist ☐ 99

**EVIDENCE:** [x] 1 None ☐ 2 Blood ☐ 3 Bullet Casing ☐ 4 Bullet Projectile ☐ 5 Clothing ☐ 6 Composite ☐ 7 Fingerprints ☐ 8 Footprints ☐ 9 Glass ☐ 10 G.S.R. Kit ☐ 11 Hair ☐ 12 Other Prints ☐ 13 Paint ☐ 14 Photographs ☐ 15 Rape Kit ☐ 16 Semen ☐ 17 Stains ☐ 18 Tools ☐ 19 Tool Markings ☐ 20 Urine ☐ 21 Vehicle ☐ 22 Weapon ☐ Gun ☐ Knife ☐ Other ☐ 99

## REVIEW

OFFICER(S) REPORTING: A. HESS — OFFICER ID NUMBER: 116
SUPERVISOR APPROVING: [signature] — DATE/TIME APPROVED: 7/8/02

STATUS: ☐ 1 Office Review ☐ 2 Patrol F/U ☐ 3 Invest F/U ☐ 4 Case Active [x] 5 Case Closed ☐ 6 Cleared ARR

SOLVABILITY: ☐ 1 Suspect(s) arrested [x] 2 Suspect(s) Named [x] 3 Suspect(s) can be located [x] 4 Suspect(s) can be described [x] 5 Suspect(s) can be identified ☐ 6 Limited Opportunity ☐ 7 Suspect vehicle can be ID'd ☐ 8 Significant MO Present ☐ 9 Special Interest ☐ 10 Witness(es) Available ☐ 11 Major Injury/Sex Related ☐ 12 Property loss over $10,000 ☐ 13 Property traceable ☐ 14 Evidence Tec (Prints/Composite) ☐ 15 Weapon can be identified

COPIES TO: [x] D.A. ☐ INVEST. ☐ C.A.U. ☐ C.P.B. ☐ J. PROB. ☐ A. PROB. ☐ YSB ☐ NSIB ☐

**CR NUMBER:** 02-6711  **PAGE 2 OF**

**SUSPECT INFORMATION/DESCRIPTORS**

1. SUSPECT (LAST, FIRST, MIDDLE): HANSON DARELL JOSEPH
   SUSPECT ADDRESS, KNOWN HANGOUTS: 531 MONROE ST  NAPA CA 94558
2. SUSPECT (LAST, FIRST, MIDDLE):

| | SEX | RACE | DOB | HEIGHT | WEIGHT | HAIR | EYES |
|---|---|---|---|---|---|---|---|
| | W M | W | 94558 | 5'8" | 160 | RED | GRN |

APPROVED BY

**SUSPECT VEHICLE**

| | YEAR | MAKE | MODEL | STYLE | COLOR/COLOR |
|---|---|---|---|---|---|
| LICENSE NO: 4DY1312 | STATE: CA | 95 | MAZDA | 4 DR. | PATROL | GRN |

DIVISION: 
DATE/TIME OF REPORT: 7/1/02  2:00

**REPORTING OFFICER:** A. LESS
**D#:** 116

**GANG** — KNOWN — SUSPECTED — YES — NO

**WEAPONS**
CAP/HAT
COAT/JACKET: BLUE WHITE
PANTS
SHIRT
SHOES
MASK
GLOVE
JEWELRY
GLASSES

ADDITIONAL DESCRIPTION

SCARS/MARKS/TATTOOS

02- 6711
NAPA POLICE DEPARTMENT CASE NUMBER

# NAPA POLICE DEPARTMENT
## WITNESS STATEMENT

GARCIA   RUDOLPH   YOVALLE
**NAME** (Last, First, Middle Name or Initial)

**DATE OF BIRTH**

DATE 7/5/02

563  MONROE  ST.
**HOME ADDRESS**

**HOME PHONE NUMBER**

TIME 1555

**BUSINESS ADDRESS**

**BUSINESS PHONE NUMBER**

I WAS WALKING MY DOG SOUTH ON MONROE STREET TOWARDS LAUREL STREET
I STOPPED AT THE STOP SIGN, ON THE CORNER OF MONROE / LAUREL ST AND
PETTED MY DOG. I WALKED FOR AWHILE. ON MY WAY HOME
I WAS WALKING NORTH ON MONROE ABOUT 18 INCHES FROM CURB,
RIGHT IN FRONT OF THE STOP SIGN. I SAW A CAR, CHRYSLER 4 DR TAN HEADING
TOWARD ME. THE DRIVER WAS DRIVING WITH HIS MIDDLE FINGER UP
I IDENTIFIED HIM AS DARRELL WHO LIVES AT 531 MONROE ST. THE DOG WAS
NEAREST THE STREET. THE CAR ACCELERATES TOWARDS ME. SWERVING TOWARDS
ME. I GOT ON THE CURB. AND THE CAR HITS MY DOG, SIDE SWIPES. THE DOG
WAS UNINJURED. THE CAR THEN TAKES OFF. I WALK HOME. AND THE
CAR FOLLOWS ME AND DRIVES PAST MY RESIDENCE. I CALLED TO MY
SON, RUDY GARCIA, WHO WAS IN THE HOUSE TO CALL 911. I TOLD RUDY,
"HE IS TRYING TO KILL ME AND HIT THE DAMN DOG."

STATEMENT WRITTEN FOR GARCIA BY A. HESS 116

A. HESS 116
**WITNESS**

SIGNED Rudolph Ovalle Garcia

**WITNESS**

PAGE _____ OF _____

c:\MsPub\Forms\Patrol\WitStmt.pub

NAPA POLICE DEPARTMENT CASE NUMBER

## NAPA POLICE DEPARTMENT
## WITNESS STATEMENT

GARCIA, PERFECTO BAUER
NAME   (Last, First, Middle Name or Initial)

S63 MONROE ST NAPA
HOME ADDRESS

BUSINESS ADDRESS

DATE OF BIRTH

HOME PHONE NUMBER

BUSINESS PHONE NUMBER

DATE 7/5/02

TIME 16:10

N656S552

I WAS ON MONROE SOUTH OF LAUREL NEXT TO THE
HOUSE UP ON BLOCKS. I SAW MY DAD ROUNDING
THE CORNER OF MONROE + LAUREL ON THE NORTH-
WEST SIDE OF THE STREET. RIGHT BY THE STOP SIGN.
I TELL MY DAD TO COME AND LOOK AT THE
HOUSE UP ON BLOCKS. I HEAR A CAR COMING AND
SEE THAT IT IS DARRELL HANSEN. HE IS TRAVELING
SOUTH ON MONROE APPROACHING THE CORNER.
I SEE MY DAD TURN TO LOOK TOWARD DARRELL'S
CAR. DAD IS WALKING IN THE STREET, JUST OFF
THE CURB. (THERE ARE BUSHES AND GRASS
THERE). I SEE DARRELL MAKE A HARD SHARP
TURN WITH THE STEERING WHEEL TOWARD THE
RIGHT. HE DOESNT EVEN STOP, HE RUNS THE
STOP SIGN. MY DAD ALMOST STUMBLES, GETS
ONTO THE WEEDS. HE HAS A SHORT LEASH, PULLS
THE DOG HARD AND THE CAR SIDESWIPES THE
DOG. THE CAR BRUSHED THE DOG ON THE RIGHT
FRONT FENDER, BY THE HEADLIGHT. MY DAD
GOES TOWARD THE HOUSE. DARRELL GOES UP
LAUREL, DOES A UTURN AND COMES BACK,
REALLY SLOW. I GO THROUGH THE ALLEY
BACK TO THE HOUSE TO CHECK THE TAPES.
ON THE TAPE, IT SHOWS MY DAD LEAVING THE HOUSE
AT 20:57. IT SHOWS DARRELL LEAVING AT 21:04. HE RETURNS
AT 21:05. DAD ARRIVES HOME 21:05.48.

WITNESS   Steve TaVoy

WITNESS

SIGNED   Perfecto Bauer Garcia

PAGE _____ OF _____

c:\MsPub\Forms\Patrol\WitStmt.pub

```
12/16/03 09:02:30 CAD  LTJ4 PRECIADOI
INCIDENT ACTIVITY SUMMARY FOR #5096  12/16/03 09:02:30
SEQ: 5096  Police ** EVENT **  TYPE: RECK   RECKLESS DRIVE       DISP: RTF
ANI: 07/04/02 21:10:45                    PRI: 3           COUNCIL:
ORG: 07/04/02 21:12:26 38D2      LTA4     POS: 1          QUADRANT:
REC:                                      SOC: A            USER-1:
DSP: 07/04/02 21:16:26 38S1      LTA2     REC: PD-  43      USER-2:
ERT: 07/04/02 21:55:58                    RPT: PD-  43     SQ.MILE:
ATS: 07/04/02 22:07:44                   BEAT: P 1B    CRIME WATCH1:
TR1:                           #PERS:     MAP:         CRIME WATCH2:
TR2:                           #PERS:
HSP:                                      MINI:       VOTER PRECINT:
AVL:                                    CENSUS: 200200    WRECKER:
CLS: 07/05/02 15:35:20 38S1      LTA1                      COUNTY:
ZTR:                             RUN CARD:             MAP INDEX:
AREA:                            X COOR:                 Y COOR:
ASSIGNEE: P116      HESS
UNITS: #2Y1

AD: 563 MONROE ST. /STOCKTON  PREM:
RP:RUDY GARCIA            RA:563 MONROE          PH:(707) 265-9004 CT:Y

RESP:  WMA MID 40'S   DARREL HENSEN   DRIVING   SAND COLORED [21:12:26-HARRISON]
SEDAN  - LAST SEEN  GOING N/B MONROE [21:12:58-HARRISON]
ALMOST RAN RP'S FATHER OVER  - [21:13:12-HARRISON]
HIT RP'S FATHERS DOG  - [21:13:23-HARRISON]
ONE HEADLIGHT IS OUT [21:13:35-HARRISON]
LIVES 2 HOUSES DOWN [21:13:43-HARRISON]
DOG IS NOT INJURIED [21:14:43-HARRISON]
PER THE RP   THE SBUEJCT TRIED TO KILL HIS FATHER BY RUNNING HIM OVER
  [21:14:58-HARRISON]
X [21:15:00-HARRISON]
**  MAKE A LEFT INTO THE CAMPGROUND DOWN THE CAMPSITE C [21:36:01-HARRISON]
TAKE THE MAIN ROAD TO THE END  PATIENT ON THE WATER LINE [21:36:19-HARRISON]
^ ABOVE 2 LINE ON THE WRONG CARD  - SHOULD BE ON SEQ   5095 [21:37:54-HARRISON]
PE: RUDY GARCIA              - Reporting Party [22:44:40-ABRAMSB]
RA: 563 MONROE               - Reporting Address [22:44:40-ABRAMSB]
PH: 265-9004 (707)           - Reporting Phone [22:44:40-ABRAMSB]
~ "OI" AT 07/05/02 15:35 BY 38S1, PREVIOUS DISPOSITION CODE NAT
  [15:35:11-ULLOTHG]
CASE: #02006711   P-PD NAP [15:35:15-ULLOTHG]
Disposition code RTF entered (REPORT TO FOLLOW) [15:35:18-ULLOTHG]
~ "CO" AFTER "OI" AT 07/05/02 15:35, PREV 07/04/02 22:44 [15:35:20-ULLOTHG]

UNIT     START TIME     END TIME  ST  SS  ASSIGNEE1   COMMENTS
2Y1    07/04/02 21:16:26 - 21:55:58  DP  92  P116
2Y1    07/04/02 21:55:58 - 22:07:44  E   97  P116
2Y1    07/04/02 22:07:44 - 22:20:36  S   98  P116
2Y1    07/04/02 22:20:36 - 22:44:31  S   98  P116       533 MONROE
2Y1    07/04/02 22:44:31 - 22:44:40  S   98  P116       NCDC
```

CONTROLLED DOCUMENT
CONFIDENTIAL INFORMATION
DUPLICATION OR REISSUANCE CONTROLLED BY LAW
TO: Perfecto Garcia
BY: I.P.
DATE: DEC 1 6 2003
NAPA POLICE

CH-140

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name and state bar number, if attorney):* | FOR COURT USE ONLY |
|---|---|

ADDRESS WHERE YOU WANT MAIL SENT:

Rudy O. Garcia
563 Monroe Street
Napa, CA 94558

TELEPHONE NO. *(Optional):* (707) 422-3244   FAX NO. *(Optional):*

E-MAIL ADDRESS *(Optional):*

ATTORNEY FOR *(Name):* Self-represented

**CERTIFIED COPY**

**ENDORSED**

MAR 2 5 2004

Clerk of the Napa Superior Court

By: L.M. Hunter
Deputy

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Napa
STREET ADDRESS: 825 Brown Street
MAILING ADDRESS:
CITY AND ZIP CODE: Napa, CA 94559
BRANCH NAME:

PLAINTIFF: Rudy O. Garcia
Perfecto B. Garcia
DEFENDANT: Darrell Joseph Hanson

| Amended   ORDER AFTER HEARING ON PETITION FOR INJUNCTION PROHIBITING CIVIL HARASSMENT (CLETS) | CASE NUMBER: 26-21550 |
|---|---|
| | Judge: Tisher |
| | Dept: A |

---

1. THIS ORDER, EXCEPT FOR AWARD OF ATTORNEY FEES AND COSTS, SHALL EXPIRE AT MIDNIGHT ON

   *(date):* 06/19/06   IF NO DATE IS PRESENT, THIS ORDER EXPIRES 3 YEARS FROM THE DATE OF ISSUANCE.

2. This proceeding came on for hearing as follows:

   Date: 06/19/03   Time: 8:30 a.m.   Dept.: A   Room:

3. Judicial officer *(name)*: Tisher   ☐ Temporary judge

4. a. ☒ Plaintiff present   ☐ Attorney present *(name):*
   b. ☒ Defendant present   ☐ Attorney present *(name):*

**THE COURT FINDS**

5. a. The defendant is *(name):* Darrell Joseph Hanson

   Sex: ☒ M ☐ F Ht.: _____ Wt.: 160 Hair Color: Bln Eye Color: Grn Race W Age: 39 Date of Birth: 05/13/64

   b. The protected person is *(name):* Rudy O. Garcia

   Sex: ☒ M ☐ F Date of Birth *(optional):* 02/06/38

   c. Protected family or household members who reside with the protected person are:

   (1) *(Name):* Perfecto Garcia

   Sex: ☒ M ☐ F Date of Birth *(optional):* 02/18/59

   (2) *(Name):* Irene Garcia

   Sex: ☐ M ☒ F Date of Birth *(optional):* _____

   (3) *(Name):* Rudy B. Garcia

   Sex: ☒ M ☐ F Date of Birth *(optional):* 08/16/60

   ☐ Additional protected persons are listed on a separate page designated as Attachment 5c.

Page 1 of 3

Form Adopted for Mandatory Use
Judicial Council of California
CH-140 (Rev. January 1, 2004)
*Martin Dean's Essential Forms* ™

**ORDER AFTER HEARING ON PETITION FOR INJUNCTION PROHIBITING CIVIL HARASSMENT (CLETS)**

Code of Civil Procedure, § 527.6;
Penal Code, § 273.6(a)

GARCIA, RUDY

| PLAINTIFF (Name) Rudy Garcia | | |
| --- | --- | --- |
| | Perfecto B. Garcia | |
| DEFENDANT (Name) Darrell Joseph Hanson | | 26-21550 |

Case 2:19-cv-00035-RAJ Document 1 Filed 01/02/19 Page 87 of 102

6. After the hearing on the petition; **IT IS ORDERED THAT DEFENDANT**

   a. shall not contact, molest, harass, attack, strike, threaten, sexually assault, batter, telephone, communicate by any means (including mail, fax, or e-mail), follow, stalk, destroy the personal property of, disturb the peace of, keep under surveillance, or block movements in public places or thoroughfares of

   [X] the person seeking the order and   [X] the other protected persons listed in item 5c.

   b. [X] shall stay at least *(specify):*   10 feet   **yards** away from the following protected persons and places:

   (1) [X] Person seeking the order
   (2) [X] The other protected persons listed in item 5c
   (3) [X] Residence of person seeking the order
   (4) [ ] Place of work of person seeking the order
   (5) [ ] The children's school or place of child care
   (6) [ ] The protected persons' vehicles
   (7) [ ] Other *(specify)* :

7. [X] **OTHER ORDERS** *(specify)* :

Mr. Hansen stipulates that he will not shine a laser into Mr. Garcia's residence.

8. **MANDATORY FIREARM RELINQUISHMENT**

   The restrained person must surrender to local law enforcement or sell to a licensed gun dealer any firearm in or subject to his or her immediate possession or control within

   a. [ ] 24 hours after issuance of this order (if restrained person is present at hearing),
   b. [ ] 48 hours after service of this order (if restrained person is not present at hearing).
   c. [ ] other *(specify)* :

The restrained person shall file a receipt with the court showing compliance with this order within 72 hours of receiving this order.

# NAPA SUPERIOR COURT

Plaintiff

## THE PEOPLE OF THE STATE OF CALIFORNIA

Defendant **DArrELL HANSON** Date of Birth **5-13-64**

Court Case Number **Cr 110949** PID & Event Number **198603344·03·09/.09** Blood Alcohol Level

## MISDEMEANOR PROBATION ORDER

☒ SUMMARY PROBATION
☐ FORMAL PROBATION

IT IS THE JUDGMENT OF THE COURT THAT THE DEFENDANT IS GUILTY OF ☒ VC23152(a) ☐ VC23152(b)
☒ ~~2800.2 (a) per (7b)~~ IMPOSITION OF SENTENCE IS SUSPENDED AND THE
DEFENDANT IS PLACED ON PROBATION FOR __5__ YEAR(S) UNDER THE FOLLOWING CONDITIONS:

1. ☒ Obey all laws.
2. ☒ Report to Post Court Services immediately.
3. ☒ Immediately report to the probation department, and obey all reasonable orders of the probation officer. Immediately notify the probation officer of any change of address or phone number.
4. ☒ Pay a $ **1,350** fine. This includes the state and county penalty assessments.
5. ☒ Serve **60** ☐ hours ☒ days on the Work Program
6. ☒ Serve **30** ☐ hours ☒ days in jail. Report to:
   ☒ Department D at 8:00 AM on: **1/3/03**
   ☒ May be served on "weekends".
   ☐ No ☐ work furlough ☐ home detention.
   ☐ Napa County Jail at 7:00 AM on:
   _____ to serve CCC time.
   ☐ Department D at 8:00 AM on:
   _____ to serve CCC time.
   ☐ Concurrent with ☐ consecutive to:
   **30 days PRC**
   ☐ Time credits: _____
   ☐
7. ☐ Immediately report to the jail, for booking only.
8. ☐ Pay the jail booking fee set by Napa County.
9. ☒ Pay a $ **100** restitution fine (PC1202.4).
10. ☐ Pay restitution to the victim(s)
    ☐ in an amount and manner to be determined
    ☐ by California Service Bureau and the Court.
    ☐ in the sum of
    $ _____
11. ☒ Submit your person, residence, vehicle and property to search and seizure by a probation officer, or any law enforcement officer, at any time of the day or night, with or without a warrant, and with or without probable cause.

12. ☐ Enroll in, pay for, and successfully complete, a counseling or education program if required by the probation officer.
13. ☐ Immediately enroll in, pay for, and successfully complete the Theft Awareness Program.
14. ☐ Immediately enroll in, pay for, and successfully complete the Educational Sentencing Program.
15. ☐ Attend ☐ AA ☐ NA at least _____ times a week.
16. ☒ Pay a $50 penalty assessment (VC23645).
17. ☐ Do not drink or possess alcoholic beverages.
18. ☒ Do not drink alcoholic beverages to excess.
19. ☒ Do not operate a motor vehicle with a measurable amount of alcohol in your blood.
20. ☒ Submit to a blood, breath, or urine test if requested by any law enforcement or probation officer.
21. ☒ Immediately enroll in, pay for, and successfully complete, ☐ DDP1 (6 wks) ☒ DDP1 (4 ½ mos) ☐ DDP1 (6 mos) ☐ DDP2 (18 mos).
22. ☐ If you meet all DMV's requirements, including proof of financial responsiblity, your privilege to operate a motor vehicle is restricted for ☒ 90 days ☐ 18 months to driving to and from work, driving to and from the drinking driver program, and driving during the scope of employment, if necessary. This restriction begins on the day your driving privilege is restored by DMV. Otherwise, DMV will suspend your privilege to operate a motor vehicle for ☒ 6 months ☐ 2 years.
23. ☐ Do not operate a motor vehicle unless it is equipped with a functioning, certified ignition interlock device. This restriction will last for ☐ 1 year ☐ 2 years ☐ 3 years following the restoration of your driving privilege by DMV. You shall install the device on all motor vehicles you own or operate except: _____. You may not drive any vehicle without a valid driver's license.
24. ☐ Your privilege to operate a motor vehicle is suspended for ☐ 6 months ☐ _____ years.

COPY TO: ☐ DEF ☐ DA ☐ PROB ☐ JAIL ☐ DEF ATTY ☐ DDP ☐ NSO ☐ PCS ☐ CSB ☐ _____

PROB1.DOT Revised 12/6/00

Page 1 of 2

CA0280200

10-15-04 0902 | DTH ☐ | ☐ R/A | 04-6000 | OF 4

## INCIDENT DESC

| CODE SECTION | CRIME | CLASSIFICATION |
|---|---|---|
| 166.4 / 12Ø3.2 / 368 PC | Vio.R.O. / V.O.P. / ELDER ABUSE | |

| DATE OCCURRED | TIME | LOCATION |
|---|---|---|
| 10-4-04 | 0800 | 563 MONROE ST |

| TO DATE | TIME | DAY(S) OCCURRED | | BEAT | RD | CLASS CODE |
|---|---|---|---|---|---|---|
| 10-4-04 | 1830 | FRI | ☒ FELONY ☐ MISDEMEANOR | 1 | | |

## INVOLVED PERSONS

**1** VICTIM OR FIRM NAME (LAST, FIRST, MIDDLE): GARCIA, RUDOLPHO — DOB: 2-6-38

RESIDENCE ADDRESS: 563 MONROE ST — CITY: NAPA — RESIDENCE PHONE: ( ) 208-3680 — BUSINESS PHONE: ( )

BUSINESS ADDRESS OR EMPLOYER: — RACE: H — SEX: M — HAIR: GRY — EYES: BRO — HT: 6-00 — WT: 240 — DRIVER'S LIC. NO.: D0865777 — STATE: CA

**2** NAME (LAST, FIRST, MIDDLE): — DOB:

RESIDENCE ADDRESS: — CITY: — RESIDENCE PHONE: ( ) — BUSINESS PHONE: ( )

BUSINESS ADDRESS OR EMPLOYER: — RACE — SEX — HAIR — EYES — HT — WT — DRIVER'S LIC. NO. — STATE

**3** NAME (LAST, FIRST, MIDDLE): — DOB:

RESIDENCE ADDRESS: — CITY: — RESIDENCE PHONE: ( ) — BUSINESS PHONE: ( )

BUSINESS ADDRESS OR EMPLOYER: — RACE — SEX — HAIR — EYES — HT — WT — DRIVER'S LIC. NO. — STATE

CONTROLLED DOCUMENT
CONFIDENTIAL INFORMATION
DUPLICATION OR REISSUANCE CONTROLLED BY LAW

## VIC VEH

LICENSE NO. — STATE — YEAR — MAKE — MODEL — STYLE — COLOR / COLOR

## PRELIMINARY INVESTIGATION

☐ AREA CHECKED ☐ DUSTED FOR PRINTS ☐ VICTIM(S) CONTACTED ☐ STATEMENTS TAKEN ☐ WITNESS(ES) CONTACTED ☐ NEIGHBORS CONTACTED ☐ SCENE DIAGRAMED ☐ SCENE PHOTOGRAPHED ☐ TIRE / SHOE TRACKS ☐ AUDIO/VIDEO INTERVIEW

TO: K. Garcia — DC — BY: — DATE: JUL 2 0 2003 — NAPA POLICE

## MO FACTORS

**SURROUNDING AREA**
☐ A Commercial / Indust
☐ B Construction Site
☐ C Park
☐ D Parking Garage
☐ E Parking Lot
☐ F Recreational
☒ G Residential
☐ H Rural
☐ I School Ground
☐ J Shopping Ctr / Business
☐ K Street / Alley
☐ Z

**STRUCTURE**
RESIDENTIAL
☐ 1 Apartment
☐ 2 Condominium
☐ 3 Duplex / Triplex
☐ 4 Mobile Home
☒ 5 Single Family
☐ 6 Town House
☐ 98

COMMERCIAL
☐ 10 Bank / Financial
☐ 11 Bar
☐ 12 Business Office
☐ 13 City Building
☐ 14 County Building
☐ 15 Entertain / Recreation
☐ 16 Fast Food
☐ 17 Gas Station
☐ 18 Hotel / Motel / B&B
☐ 19 Indus / MFG / WHSE
☐ 20 Jewelry / Coin / Pawn
☐ 21 Liquor Store
☐ 22 Market
☐ 23 Mini Mart
☐ 24 Mini Storage
☐ 25 Out Buildings
☐ 26 Pharm/Medical/Dental
☐ 27 Public Building
☐ 28 Restaurant
☐ 29 Retail Store
☐ 30 School
☐ 31 Vehicle / Boat
☐ 32 Church
☐ 99

**TARGET**
☐ 1 Attic
☐ 2 Automated Teller
☐ 3 Basement
☐ 4 Bathroom
☐ 5 Bedroom
☐ 6 Cash Reg / Drawer
☐ 7 Classrm Equip / Sup
☐ 9 Coin op Machine
☐ 10 Customer
☐ 11 Dining Room
☐ 12 Display Items
☐ 13 Family Room
☐ 14 Garage / Carport
☐ 15 Kitchen
☐ 16 Laundry Room
☐ 17 Livestock / Pets
☐ 18 Living Room
☐ 19 Office Equip / Sup
☐ 20 Owner / Employee
☐ 21 Pedestrian
☐ 22 Safe / Box
☐ 23 Sales Area
☐ 24 Storage / Shed
☐ 25 Vehicle / Boat
☐ 26 Vending Machine
☐ 27 Video Game
☐ 99

**POINT OF ENTRY**
☐ 1 Unknown
☐ 2 Front
☐ 3 Rear
☐ 4 Side
☐ 5 Ground Level
☐ 6 Upper Level
☐ 7 Adjacent Building
☐ 8 Basement
☐ 9 Door
☐ 10 Duct / Vent
☐ 11 Floor
☐ 12 Garage
☐ 13 Louvre
☐ 14 Pet Door
☐ 15 Roof
☐ 16 Sliding Glass Door
☐ 17 Wall
☐ 18 Window

**VEHICLE ONLY**
☐ 26 Driver's Side
☐ 27 Passenger Side
☐ 28 Convertible
☐ 28 Hatchback
☐ 29 Door
☐ 30 Hood
☐ 31 Sunroof
☐ 32 Trunk
☐ 33 Windwing
☐ 34 Window
☐ 99

**POINT OF EXIT**
☐

**METHOD OF ENTRY**
☐ 0 Unknown
☐ 1 Attempt Only
☐ 2 Bodily Force
☐ 3 Hid in Building
☐ 4 Kicked
☐ 5 Knob Twist
☐ 6 Lock Box
☐ 7 Lock Cut/Broken
☐ 8 Lock Picked
☐ 9 Lock Punched
☐ 10 Lock Slipped/Key
☐ 11 Open for Business
☐ 12 Pried
☐ 13 Removed
☐ 14 Smashed
☐ 15 Tunneled
☐ 16 Unlocked/No Force
☒ 98

**TOOLS USED**
☐ 20 Unknown
☐ 21 Bolt Cutter
☐ 22 Brick/Rock
☐ 23 Channel Lock/Pliers
☐ 24 Drill
☐ 25 Flashlight
☐ 26 Glass Cutter
☐ 27 Hammer
☐ 28 Hanger/Slip Device
☐ 29 Key/Combination
☐ 30 Pipe Wrench
☐ 31 Pry Tool/Bar
☐ 32 Saw/Cutting Tool
☐ 33 Screwdriver
☐ 34 Slim Jim
☐ 35 Tape/Wire
☐ 36 Torch/Ignition
☐ 37 Vice Grips
☐ 99

**SECURITY SYSTEM**
☐ 1 Audible
☐ 2 Camera
☐ 3 Dog
☐ 4 Fence/Bars
☐ 5 Guard Service
☐ 6 Neighborhood Watch
☐ 7 Operation ID
☐ 8 Outside Lighting
☐ 9 Security Sign/Sticker
☐ 10 Silent Alarm
☐ 11 Standard Locks
☐ 12 Window Bars
☐ 99

**SUSPECT ACTIONS**
☐ 0 No Loss
☐ 1 Alarm Disabled
☐ 2 Alcohol On Breath
☐ 3 Ate/Drank On Premises
☐ 4 Cased Location
☐ 5 Cash Demanded
☐ 6 Cat Burglar/Hot Prowl
☐ 7 Climaxes
☐ 8 Defecated
☐ 9 Demand Note Used
☐ 10 Exit Prepared
☐ 11 Fired Weapon
☐ 12 Followed/Stalked Vic.
☐ 13 Forced Veh Off Road
☐ 14 Gloves Worn
☐ 15 Hid in Bushes
☐ 16 Knew Loc Hidden $$
☐ 17 Lookout Used
☐ 18 Mask Worn/Hid Face
☐ 19 Matches Used f/Light
☐ 20 Masturbated
☐ 21 Multiple Suspects
☐ 96
☐ 23 Phone Disabled
☐ 24 Pillows Taken/Used
☐ 25 Power Disabled
☐ 26 Ransacked
☐ 27 Selective in Loot
☐ 28 Smoked on Premises
☐ 29 Under Influence Drugs
☐ 30 Vandalized
☐ 31 Veh Demanded/Stolen
☐ 32 Veh Req Remove Prpty
☐ 33 Vic's Clothes Cut/Rip
☐ 34 Victim's Name Used
☐ 35 Victim's Tools Used
☐ 36 Withdrw Before Climax
☐ 37 Wore Costume/Uniform

**TOOK ONLY**
☐ 38 Concealables
☐ 39 Jewelry
☐ 40 Money
☐ 41 TV/Stereo
☐ 97

**PRETENDED TO BE**
☐ 50 Delivery Person
☐ 51 Disabled Motorist
☐ 52 Need Water/Ph/Bthrm
☐ 53 Lending Assistance
☐ 54 Person Finding Money
☐ 55 Police/Law
☐ 56 Repair Person
☐ 57 Seeking Assistance
☐ 58 Seeking Employment
☐ 98

**VICTIM WAS**
☐ 60 Blindfolded
☐ 61 Bound/Gagged
☐ 62 Disrobed By Suspect
☐ 63 Forced to Cover Face
☐ 64 Forced to Disrobe
☐ 65 Forced to Fondle Susp
☐ 66 Forced to Lie on Floor
☐ 67 Forced Masturbate Sus.
☐ 68 Forced to Move
☐ 69 Forced to Rear of Store
☐ 70 Handcuffed
☐ 71 Injured/Hit
☐ 72 Kidnapped
☐ 73 Locked In
☐ 74 Made to Count
☐ 75 Molested
☐ 76 Orally Copulated
☐ 77 Other Sex Acts
☐ 78 Raped With Object
☐ 79 Rape More Than Once
☐ 80 Sodomized
☐ 81 Threatened
☐ 82 Tortured
☐ 83 Tourist
☐ 99

**EVIDENCE**
☐ 1 None
☐ 2 Blood
☐ 3 Bullet Casing
☐ 4 Bullet Projectile
☐ 5 Clothing
☐ 6 Composite
☐ 7 Fingerprints
☐ 8 Foot Prints
☐ 9 Glass
☐ 10 G. S. R. Kit
☐ 11 Hair
☐ 12 Other Prints
☐ 13 Paint
☒ 14 Photographs
☐ 15 Rape Kit
☐ 16 Semen
☐ 17 Stains
☐ 18 Tools
☐ 19 Tool Markings
☐ 20 Urine
☐ 21 Vehicle
☐ 22 Weapon
☐ Gun
☐ Knife
☐ Other
☐ 99

## REVIEW

OFFICER(S) REPORTING: [signature] — OFF. ID NO.: 94

SUPERVISOR APPROVING: [signature] — DATE/TIME APPROVED: 6-17-04 0730

STATUS: ☐ 1 Office Review ☐ 2 Patrol F/U ☐ 3 Invest F/U ☐ 4 Case Active ☐ 5 Case Closed ☐ 6 Cleared ARR

**SOLVABILITY**
☐ 1 SUSP(S) ARRESTED
☒ 2 Susp(s) Named
☐ 3 Susp(s) Can Be Located
☐ 4 Susp(s) Described
☐ 5 Susp(s) Can Be ID'd
☐ 6 Limited Opportunity
☐ 7 Susp Vehicle Can Be ID'd
☐ 8 Significant MO Present
☐ 9 Special Interest
☐ 10 Witness Available
☐ 11 Major Injury/Sex Related
☐ 12 Property Loss over 10,000
☐ 13 Property Traceable
☐ 14 Evid Tech (Prints/Composite)
☐ 15 Weapon Can Be ID'd

**COPIES TO**
☒ D.A.
☐ INVEST
☐ C. P. B.
☐ Y. S. B.
☐ N.S. I. B.
☐ J PROB
☐ A PROB
☐

# SUSPECT / MISSING PERSON · RUNAWAY INFORMATION/DESCRIPTORS

**1** NAME (LAST, FIRST, MIDDLE): HANSEN, DARREL   NICKNAME (AKA):   DOB: 5-13-61   RACE: WM   SEX: M   AGE: 40   HAIR: BLN   EYES: BLU   HT: 5-08   WT: 150   BUILD: THIN

RES. ADDRESS: 561 MONROE ST   CITY: NAPA   RES. PHONE NO.: (707) 255-5919   DL NO.: C0551577   STATE: CA

BUS. ADDRESS, KNOWN HANGOUTS:   OCCUPATION:   BUS. PHONE NO.:   S.S.N.:

**2** NAME (LAST, FIRST, MIDDLE):   NICKNAME (AKA):   DOB:   RACE:   SEX:   AGE:   HAIR:   EYES:   HT:   WT:   BUILD:

RES. ADDRESS:   CITY:   RES. PHONE NO.:   STAT

BUS. ADDRESS, KNOWN HANGOUTS:   OCCUPATION:   BUS. PHONE NO.:   S.S.N.:

---

## Descriptors

**HAIR LENGTH** 1 2
- 1 Unknown (99)
- 2 Bald (06)
- 3 Collar Length (02)
- 4 Long (03)
- 5 Receding
- 6 Shaved (01)
- 7 Short (02)
- 8 Shoulder (03)
- 97 (88)
- 9 Greasy
- 10 Military
- 11 Pony Tail
- 12 Processed
- 13 Punk (04)
- 14 Straight
- 15 Wavy
- 16 Bangs
- 17 Center Part
- 18 Combed Back
- 19 Curlers
- 20 Dirty
- 21 Side Part
- 22 Styled (04)

**HAIR TYPE** 1 2
- 1 Unknown
- 2 Coarse
- 3 Fine
- 4 Thick
- 5 Thinning
- 6 Wig
- 7 Wiry

**HAIR STYLE** 1 2
- 1 Unknown
- 2 Afro/Natural (05)
- 3 Braided
- 4 Bushy
- 5 Butch
- 6 Crew Cut
- 7 Curly
- 8 Flat Top

**FACIAL HAIR** 1 2
- 1 Unknown (99)
- 2 Beard (03)
- 3 Clean Shaven (06)
- 4 Fuzz
- 5 Goatee (04)
- 6 Lower Lip
- 7 Mustache (02)
- 8 Sideburns (05)
- 9 Unshaven (05)

**BEARDS**
- 10 Abe Lincoln
- 11 Anchor Beard
- 12 Center Part
- 13 Desg w/Mus
- 14 Exposed Chin
- 15 Fork Beard
- 16 Full Beard
- 17 Large Full
- 18 Large Ring
- 19 Mutton Chops
- 20 Old Dutch
- 22 3-Point Goatee
- 23 Scraggly
- 24 Short
- 25 Small Ring
- 26 Sthrn Colonel
- 27 Van Dyke
- 97

**MUSTACHES**
- 28 Bushy
- 29 Confucious
- 30 Fu Manchu
- 31 Handle Bar
- 32 Long Pointed
- 33 Low Extension
- 34 Pointed w/Part
- 35 Short
- 36 Square
- 37 Thick
- 38 Thin
- 39 Turkish

**SIDEBURNS** 1 2
- 40 Lrg Cheek
- 41 Lrg Flare
- 42 Lrg Rev Flare
- 43 Lobe Lng Flare
- 44 Lobe Lng Flare
- 45 Mid Ear
- 46 Pointed

**FACIAL SHAPE** 1 2
- 1 Unknown
- 2 Broad
- 3 High Cheekbone
- 4 Long
- 5 Oval
- 6 Round
- 7 Thin

**COMPLEXION** 1 2
- 1 Unknown
- 2 Acne/Pocked
- 3 Clear
- 4 Dark
- 5 Freckled
- 6 Light/Fair
- 7 Medium
- 8 Olive
- 9 Pale/Sallow
- 10 Ruddy
- 11 Tanned
- 12 Wrinkled
- 99

**APPEARANCE** 1 2
- 1 Unknown
- 2 Casual
- 3 Conservative
- 4 Dirty
- 5 Disguise
- 6 Dressy
- 7 Good Looking
- 8 Unkempt
- 9 Unusual Odor
- 10 Well Groomed

**DISTING. FEATURES** 1 2
- 1 Amp/Mis Limb
- 2 Artificial Limb
- 3 Blind
- 4 Cane/Crutches
- 5 Cleft Chin
- 6 Crippled Part
- 7 Deaf
- 8 Deformed Limb
- 9 Dimpled Cheeks
- 10 Growths/Moles
- 11 Hearing Aid
- 12 Limp
- 13 Skin Discolored
- 14 Spastic Movemnt
- 15 Wheelchair

**FACIAL FEA. ODD.** 1 2
- 20 Angular
- 21 Unusl Shp Face
- 22 Large Head
- 23 Small Head
- 24 Unusl Shp Head
- 25 Bulging Forehd
- 26 Sloped Forehead
- 27 Close Set Eyes
- 28 Cross/Cck Eyes
- 29 Diff Shape Eyes
- 30 Diff Size Eyes
- 31 Wide Set Eyes
- 32 Beak Nose
- 33 Brkn/Crk Nose
- 34 Bulbous Nose
- 35 Flared Nostrils
- 36 Pierced Nose
- 37 Unusl Shp Nose
- 38 Cleft Lip
- 39 Curved Lips
- 40 Hare Lip
- 41 Cauliflwr Ears
- 42 Dumbo Ears
- 43 Large Ears
- 44 Mutilated Ears
- 45 Pierced Ears
- 46 Small Ears
- 47 Body Piercing

**TEETH** 1 2
- 1 Unknown (99)
- 2 Braces
- 3 Broken (03)
- 4 Chipped (03)
- 5 Crooked (04)
- 6 False/none(0
- 7 Gapped (06)
- 8 Gold Cap (02
- 9 Jeweled
- 10 Missing (01)
- 11 Retainer
- 12 Silver Cap
- 13 Stained/Deca

**SPEECH** 1 2
- 1 Unknown
- 2 Accent - US
- 3 Accent - For
- 4 Disguised
- 5 Lisps
- 6 Mumbles
- 8 Non English
- 9 Rapid
- 10 Slurred
- 11 Spch Impeod
- 12 Stuttering
- 99

---

| | SUBJECT 1 | CODE | SUBJECT #2 | CODE | SUBJECT #1 | L | R | | L | R | SUBJECT #2 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 CAP/HAT | | | | | ARM | | | | | | |
| 2 COAT/JACKET | | | | | BACK TORSO | | | | | | |
| 3 PANTS | | | | | FACE | | | | | | |
| 4 SHIRT | | | | | FRONT TORSO | | | | | | |
| 5 SHOES | | | | | HAND | | | | | | |
| 6 MASK | | | | | LEG | | | | | | |
| 7 GLOVES | | | | | NECK | | | | | | |
| 8 JEWELRY | | | | | SHOULDER | | | | | | |
| 9 GLASSES | | | | | | | | | | | |
| 10 | | | | | | | | | | | |
| 11 | | | | | | | | | | | |

(SCARS/MARKS/TATTOOS)

**GANG**   ADDITIONAL DESCRIPTION:

KNOWN / SUSPECTED / ASSOCIATED

**MUPS DATA** Y N
- Dental chart/xrays avail.
- Juv. - Dt. of emancipation
- Blood type
- Fingerprints avail.
- Footprints avail.
- Body xrays avail.
- Circumcised
- Dr.
- DDS.

**LIFESTYLE (MUPS ENTRY ONLY)**
- 01 Bisexual
- 02 Homosexual
- 03 Transient/Street Person
- 04 Transvestite
- 05 Hitchhiker
- 06 Gang Member
- 07 Runaway
- 08 Prostitution
- 09 Drug Involvement
- 10 Normal

---

**WEAPONS** 1 2
- 1 Simulated
- 2 Handgun
- 3 Rifle
- 4 Shotgun
- 5 Toy Gun
- 6 Knife
- 7 Toy Knife
- 8 Baseball Bat
- 9 Club/Board
- 10 Vehicle
- 99

**GUN FEATURE**
- 1 Altered Stock
- 2 Automatic
- 3 Blue Steel
- 4 Bolt Action
- 5 Chrome/Nickel
- 6 Derringer
- 7 Double Barrel
- 8 Over-Under
- 9 Pump
- 10 Revolver
- 11 Sawed Off
- 12 Single Shot

**HANDED** 1 2
- A Ambidexterous
- L Left Handed
- R Right Handed
- U Unknown

**CALIBER/LENGTH**
- Cal
- Bbl
- Cal
- Bbl
- ga
- Grips

**KNIFE FEATURE** 1 2
- 25 Butcher
- 26 Dirk/Dagger
- 27 Folding - Small
- 28 Folding - Large
- 29 Hunting
- 30 Kitchen
- 31 Bayonet
- 32 Switch Blade
- 33 Butterfly
- 34 Tile
- 99

**BLADE/HANDLE DESC**
- Blade Lng
- Handle
- Blade Lng
- Handle

---

**VEHICLE**

LICENSE NO.   STATE   YEAR   MAKE   MODEL   STYLE   COLOR/COLOR

ADDITIONAL DESCRIPTION:

REPORTING OFFICER:   ID#: 94   DIVISION: PATROL   DATE/TIME OF REPORT: 6-16-04 1600   APPROVED BY:

NAPA POLICE DEPARTMENT

| | Continuation | Page |
|---|---|---|
| ✓ | Incident Report | Of 4 |
| | Supplemental | |
| | Print / Photo Log | |

| INCIDENT/CRIME CLASS | LOCATION | | DATE/TIME OCCUR | CLASS CODE | BEAT |
|---|---|---|---|---|---|
| | | | | | RD |

**INVOLVED PERSONS**

| NAME (LAST, FIRST, MIDDLE) | RACE | SEX | HAIR | EYES | HT | WT | DL NO. | STATE |
|---|---|---|---|---|---|---|---|---|
| RESIDENCE | | | DOB | RES PH NO. | | BUS PH NO. | | |
| NAME (LAST, FIRST, MIDDLE) | RACE | SEX | HAIR | EYES | HT | WT | DL NO. | STATE |
| RESIDENCE | | | DOB | RES PH NO. | | BUS PH NO. | | |

C-CATEGORY (Used to list latents - L or photos - P)  CODE - Property Code: S - Stolen  R - Recovered  L - Lost  EV - Evidence(Prints/Photos only)  V - Vandalized  D - Damaged
(Use all applicable codes, e.g. property both stolen & recovered, Code is S/R.  All packaged items of evidence other than prints/photos use Property Packaging Report.)

| C | ITEM | ARTICLE NAME | QTY | SERIAL NO. | BRAND/MAKE | MODEL NAME/NO. | CODE | VALUE |
|---|---|---|---|---|---|---|---|---|

SUMMARY: V-GARCIA HAS A RESTRAINING ORDER AGAINST HANSON. HANSON TURNED IN A COMPLAINT ABOUT VEHICLES ON GARCIAS PROPERTY TO NAPA CITY CODE ENFORCEMENT. GARCIA STATES HANSON DID SO TO ANNOY AND HARASS HIM.

INVESTIGATIVE NOTES: ON 6-15-04 AT ABOUT 1000 HRS CONTACTED V-GARCIA IN THE P.D. GARCIA GAVE THE FOLLOWING SUMMARIZED STATEMENT: ON 6-5-04 HE RECEIVED A LETTER FROM CODE ENFORCEMENT. THE LETTER SAID HE WAS IN VIOLATION OF AN ORDINANCE FOR STORING UNLICENSED VEHICLES ON HIS PROPERTY. YOU CANNOT SEE INTO HIS YARD AND HANSON WOULD HAVE GONE INTO HIS YARD TO KNOW ABOUT THE VEHICLES. HE WENT TO CODE ENFORCEMENT TO LOOK AT THE FILE. BILL CHAPPELL SHOWED HIM THE FILE. DARREL HANSON'S NAME WAS WRITTEN ON THE TOP OF ONE OF THE PAGES. CHAPPELL CONFIRMED THAT HANSON WAS THE PERSON WHO SUBMITTED THE COMPLAINT. THIS COMPLAINT WAS FILED TO HARASS AND CAUSE STRESS. HANSON IS AWARE OF HIS MEDICAL PROBLEMS. HANSON COULD ONLY KNOW ABOUT THE VEHICLES BY ENTERING THE BACKYARD BECAUSE OF A LARGE FENCE AND HEDGE AROUND HIS PROPERTY. (REFER TO HIS WRITTEN SUPPLEMENT).

GARCIA PROVIDED PHOTOGRAPHS DATED 11-29-03 AND 12-28-04 (SEE ATTACHED), A COPY OF THE CODE ENFORCEMENT LETTER, A COPY OF A DESCRIPTION OF HIS MEDICAL CONDITION

| CASH, NOTES $ | FURS, CLOTHING $ | OFFICE EQUIP $ | FIREARMS $ | CONSUMABLE GOODS $ | MISC $ |
|---|---|---|---|---|---|
| JEWELRY, PREC METALS $ | VEHICLE $ | TV, RADIOS, CAMERAS $ | HOUSEHOLD GOODS $ | LIVESTOCK $ | TOTAL $ |

| REPORTING OFFICER | ID NO. | DIVISION | DATE & TIME OF REPORT | STATUS | APPROVED | COPIES TO: |
|---|---|---|---|---|---|---|
| | 94 | PATROL | 6-16-04  1600 | | DH | ☐ Invest  ☐ Probation  ☐ D.A.  ☐ Property |

**NAPA POLICE DEPARTMENT**

☐ Continuation
☐ Incident Report
☐ Supplemental

☐ Stolen Property
☐ Print / Photo Log

CA0280200

| INCIDENT/CRIME CLASS | LOCATION | | DATE/TIME OCCUR | CLASS CODE | BEAT |
| | | | | | RD |

| | NAME (LAST, FIRST, MIDDLE) | | | RACE | SEX | HAIR | EYES | HT | WT | DL NO. | | STATE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| INVOLVED PERSONS | RESIDENCE | | | | DOB | | RES PH NO. | | BUS PH NO. | | | |
| | NAME (LAST, FIRST, MIDDLE) | | | RACE | SEX | HAIR | EYES | HT | WT | DL NO. | | STATE |
| | RESIDENCE | | | | DOB | | RES PH NO. | | BUS PH NO. | | | |

C-CATEGORY (Used to list latents - L or photos - P)   CODE - Property Code: S - Stolen   R - Recovered   L - Lost   EV - Evidence(Prints/Photos only)   V - Vandalized   D - Damaged
(Use all applicable codes, e.g. property both stolen & recovered, Code is S/R.  All packaged items of evidence other than prints/photos use Property Packaging Report.)

| C | ITEM | ARTICLE NAME | QTY | SERIAL NO. | BRAND/MAKE | MODEL NAME/NO. | CODE | VALUE |
|---|---|---|---|---|---|---|---|---|

A COPY OF AN EARLIER COMPLAINT DATED 6-95 AND A COPY OF THE PHOTOS TAKEN BY CHAPPELL. (SEE ATTACHED)

CHAPPELL NO LONGER WORKS FOR THE CITY OF NAPA. I CONTACTED CHAPPELL. HE SAID THAT HANSONS NAME WAS WRITTEN ON ONE OF THE PAGES IN PENCIL. GARCIA ASKED HIM IF THAT IS WHO FILED THE COMPLAINT. HE DIDN'T RESPOND TO GARCIA BUT GARCIA OBVIOUSLY KNEW HANSON WAS INVOLVED.

GARCIA REQUESTS CHARGES BE FILED ON HANSON FOR 1203.2 P.C (VOP), 1.664 P.C (VIO, R.O.), AND 368 P.C.- ELDER ABUSE

I CHECKED GARCIAS LOT FROM THE AREA WEST OF HIS PROPERTY. I COULD BARELY SEE THE TOP OF A PICK UP WITHOUT HAVING TO CLIMB ON ANYTHING. TO SEE THE REST OF THE YARD YOU WOULD HAVE TO GET NEXT TO THE FENCE OR CLIMB ON TOP OF SOMETHING.

GARCIA AGREED HE IS TECHNICALLY IN VIOLATION OF THE ORDINANCE BUT HE HAS RESOLVED THE ISSUE IN THE PAST WITH CODE ENFORCEMENT (SEE CODE ENFORCEMENT LETTER 6-95).

DISPOSITION: NO FURTHER ACTION BY THIS OFFICER.

| CASH, NOTES $ | FURS, CLOTHING $ | OFFICE EQUIP $ | FIREARMS $ | CONSUMABLE GOODS $ | MISC $ |
|---|---|---|---|---|---|
| JEWELRY, PREC METALS $ | VEHICLE $ | TV, RADIOS, CAMERAS $ | HOUSEHOLD GOODS $ | LIVESTOCK $ | TOTAL $ |

| REPORTING OFFICER | ID NO/ 94 | DIVISION PATROL | DATE & TIME OF REPORT | STATUS | APPROVED | COPIES TO: ☐ Invest ☐ Probation ☐ D.A. ☐ Property |



**CITY of NAPA**

June 13, 1995

**FIRE PREVENTION**
**CODE ENFORCEMENT**
1600 First Street
PO Box 660
Napa, California 94559-0660
(707) 257-9590
FAX (707) 257-9522

Rudolph Jr. on Irene Garcia
563 Monroe Street
Napa, California 94559

SUBJECT:  COURTESY NOTICE OF VIOLATION

Dear Mr. or Mrs. Garcia:

The City of Napa is very concerned about preserving and maintaining clean, well-kept neighborhoods which all residents can enjoy. The City has received an alleged complaint concerning the condition of your property. An inspection of your property was conducted on June 12, 1995, two inoperative vehicles were observed in your driveway. It has also been alleged that there are numerous inoperative vehicles in your rear yard.

This letter is being brought to your attention to give you the opportunity to respond and take action. Please be advised that you may be in violation of the following Napa Municipal Codes:

Section 8.16.010.D.6 and 10 - Prohibits the storage of automobiles, automobile parts, equipment, inoperative vehicles, junk and debris on private property for more than seventy-two (72) consecutive hours.

You are hereby requested, within thirty (30) days from the date of this letter to repair, remove or garage all inoperative vehicles and remove all vehicles from your rear yard. An inspection for compliance will be conducted on July 13, 1995.

ALL REQUESTS, CORRECTIONS OR REPAIRS MUST BE COMPLETED PRIOR TO THE SCHEDULED INSPECTION FOR COMPLIANCE DATE INDICATED IN THIS LETTER. IF ADDITIONAL INSPECTIONS ARE NEEDED, THERE WILL BE A REINSPECTION AND ADMINISTRATIVE CHARGE OF $85.26 PER REINSPECTION AND YOU WILL BE RESPONSIBLE FOR ALL LEGAL FEES SHOULD LEGAL ACTION BE SOUGHT. SHOULD THIS SAME VIOLATION RECUR WITHIN A ONE-YEAR PERIOD AFTER ABATEMENT, YOU WILL AUTOMATICALLY RECEIVE A RECURRING NON-COMPLIANCE CHARGE.

Thank you for your cooperation in this matter. Should you require further information, please contact me at (707) 257-9590.

Sincerely,

Desiree Lannertone
Code Enforcement Assistant

dl:

7/13-at 10:00am.
-95-

54-6220

ZONING COMPLAINT FORM

PROPERTY OWNER: Rudolph Jr. or Irene Garcia  Phone# 2559323
ADDRESS: SAME        9

VIOLATION ADDRESS:      563 Monroe

15 CARS IN REAR YEAD

OFFICE USE
DATE RECIEVED 5.5.95
RECIEVED by  D
Z. V. No.      95-262
District       32
Date Closed   7-13-95

COMPLAINTANT: RICHARD ELDRIDGE

| DATE | TIME | RESULTS OF INSPECTION |
|---|---|---|
| 6/12/95 | S+D | D/B Revealed 2 inops in D/W. Unable to see rear yard! |
| 6/13/95 | | Ltr checked 7/13 at 10am. |
| 6/15/95 | | Mr Garcia came into request ext. He claims he is completely disabled although doesn't look it. Supposedly Murry came to his house several years ago + advised that inops. in rear are okey just keep them off d/w. Wanted one year extension, told him I couldn't do that but get inops off d/w + I would advised what to do with rear yard when I reinspect on 7/13 at 10am. |
| 7/13/95 | | F/1 revealed inops in driveway gone Per conversation with susie, this is a neighborhood feud ( see 95-350 ) plus as long as cars have been removed from driveway plus public view we can close the file. |

* Note: Overholser is handling 95-350

* D/W = Driveway

04-6220



# CITY of NAPA

FIRE PREVENTION
CODE ENFORCEMENT
1600 First Street
Mailing Address: P.O. Box 660
Napa, California 94559-0660
(707) 257-9590
FAX (707) 257-9522

June 4, 2004

Randolph or Irene Garcia
563 Monroe St.
Napa, CA 94559

SUBJECT:  COURTESY NOTICE OF VIOLATION – **563 MONROE ST.**

Dear Randolph or Irene Garcia:

The City of Napa is very concerned about maintaining City codes within all neighborhoods to preserve the aesthetic and peaceful enjoyment for all residents. The City received a complaint of an alleged violation on your property specifically, that you have several vehicles in your rear yard that are unlicensed or inoperative. An inspection was conducted and verified this complaint.

I realize the City has many codes that you may not be familiar with; therefore, this letter is being brought to your attention to give you the opportunity to respond and take action. Please be advised that you are in violation of the following codes:

- Napa Municipal Code Section 8.16.010 – It shall be unlawful and declared a public nuisance for any person owning, renting, leasing, occupying or having charge or possession of any property in the City of Napa, to maintain such property in such a manner that any of the following conditions are found to exist thereon:

    o D10 – Prohibits the parking or storing of inoperative, non-registered, abandoned, wrecked, dismantled or unregistered vehicles, including recreational vehicles on private property for over 72 hours.

You are hereby required, within thirty, (30) days from the date of this letter to:

1. Place the inoperative and unlicensed vehicles inside your garage; or remove the inoperative and unlicensed vehicles from your property; or repair the vehicles to operable condition to include current registration and insurance.

Randolph or Irene Garcia
SJ: Notice of Violation
June 4, 2004
Page 2

To ensure compliance, an inspection will be conducted on July 7, 2004. Failure to comply will result in a non-compliance charge, possible civil penalty and legal action.

***Be advised Napa Municipal Code General Provisions 1.20.010 B – General Penalty – A person is guilty of a separate offense for each day during any portion of which the violation is committed, continued or permitted by that person.***

**NOTE: READ ATTACHED NOTICE. FURTHER, ALL REQUESTS, CORRECTIONS OR REPAIRS MUST BE COMPLETED PRIOR TO THE SCHEDULED INSPECTION FOR COMPLIANCE DATE OF: JULY 7, 2004. FAILURE TO COMPLY BY THE AFOREMENTIONED DATE, YOU SHALL BE RESPONSIBLE FOR THE FOLLOWING: A RE-INSPECTION CHARGE AT THE CURRENT PERSONNEL COSTS PER RESOLUTION 16; A $10.00 ADMINISTRATIVE CHARGE; ALL OTHER DIRECT AND INDIRECT COSTS INCURRED IN ABATING THE VIOLATIONS OR CAUSING THE OWNER OR RESPONSIBLE PERSON TO ABATE THE VIOLATIONS PER SECTION 8.16.090; AND POSSIBLE CIVIL PENALTIES OF $500.00 PER VIOLATION PER SECTION 8.16.125. AS OF JANUARY 21, 2003 THE CITY COUNCIL ADOPTED SECTION 8.16.125 B THAT STATES "ANY PERSON OR ENTITY WHO IS DETERMINED BY NOTICE TO ABATE PURSUANT TO SECTION 8.16.040 OR ANY ORDER OR DECISION PURSUANT TO SECTION 8.16.060 AND/OR 8.16.070 TO HAVE VIOLATED ONE OR MORE PROVISIONS OF THIS CHAPTER ON MORE THAN ONE OCCASION WITHIN ANY ONE-YEAR PERIOD FOLLOWING ANY OTHER NOTICE TO ABATE PURSUANT TO SECTION 8.16.040 OR ANY OTHER ORDER OR DECISION PURSUANT TO SECTIONS 8.16.060 AND/OR 8.16.070 SHALL BE REQUIRED TO PAY CIVIL PENALTIES OF $1,000.00".**

Your prompt attention in correcting this violation is needed to preserve the aesthetic, environmental quality and safety of our neighborhoods. Thank you for your cooperation in this matter. Please, contact me at (707) 257-9385 if you have any questions or need further information.

Sincerely,

Bill Chappell
Assistant Code Enforcement Officer

bc/ENCLOSURE: 8.16.090 NOTICE

NAPA POLICE DEPARTMENT
**NAPA POLICE DEPARTMENT**
NAPA POLICE DEPARTMENT CASE NUMBER

**WITNESS STATEMENT**

NAME (Last, First, Middle Name or Initial): GARCIA, RUDOLPH O.
DATE OF BIRTH: 2-6-38
DATE: 6-15-04

HOME ADDRESS: 563 MONROE ST, NAPA
HOME PHONE NUMBER: 707-208-3680
TIME:

BUSINESS ADDRESS: N/A
BUSINESS PHONE NUMBER: N/A

DOCUMENT EVIDENCE:

1. A copy of a letter of the city code enforcement.

2. A copy of two photos of my backyard taken by Mr. Bill Chappell.

3. Photos dated November 29, 2003 of Darrel Hanson video taping my back yard.

4. A brief description of "GRADENIGO'S SYNDROME" from the Internet (www.whonamedit.com) pg. 1 and 2.

5

WITNESS: Perfecto B. Garcia

SIGNED: Rudolph Garcia

WITNESS:

liz palayo
dicktated

PAGE 3 OF 3



**GARY LIEBERSTEIN**
**DISTRICT ATTORNEY**

# NAPA COUNTY

## DISTRICT ATTORNEY'S OFFICE
## CRIMINAL DIVISION

931  Parkway Mall, P.O. Box 720
Napa, California   94559-0720
Phone: (707) 253-4211      Fax: (707) 253-4041

August 9, 2004

Dear Mr. Garcia:

I am responding to your request for written documentation regarding Napa Police Department case numbers 03-12387 and 04-6220.  Both cases were submitted to our office and in both cases we elected not to file charges due to insufficient evidence.

Sincerely,

Mark Boessenecker
Chief Deputy District Attorney

(For pickup)

## RE: PG&E

Marks, Keith <kmarks@cityofnapa.org>

Wed 11/28/2018, 9:53 AM

**To:** Perfecto Garcia <pbg@att.net>; pbg1959@outlook.com <pbg1959@outlook.com>;
Techel, Jill <jtechel@cityofnapa.org>
**Cc:** Mayes, Darrell <dmayes@cityofnapa.org>; Jones, David C. (Attorney) <cjones@cityofnapa.org>;
Morris, Erin <emorris@cityofnapa.org>; Sowards, Gregory <gsowards@cityofnapa.org>

Good morning Perfecto

I'm responding to your request for an approval for gas service at 563 Monroe.
PG& E requires any gas service not in use within the last 90 days be tested for line leakage.
Since the original inspection was over 2 years ago, another gas test is required.  In order to have
the test done, either a contractor or the  title holder of the property needs to obtain a plumbing
permit.  Once the permit is issued, someone needs to air test the line to assure there are no leaks
and have it inspected. We cannot approve gas service at the property until this done.
As you know, however, in order for a plumbing permit to be issued, the property needs to be in
 safe condition, and as you know, the foundation issue has not been taken care of.  In fact, the
California State License Board investigated the foundation and determined that the foundations
would not support the building as it sits.
*Occupancy of the house is unlawful in its current state*. It was deemed an unsafe structure
after the 2014 Napa Earth quake, and it was ordered not to be unoccupied until repairs were
made.
So, just so you are clear, the inspection that was done by Marie Taylor back in 2016 is not valid
and until the foundation is repaired under a new permit, or the house is lowered to its original
state, no permits can be issued.  This is a safety requirement that cannot be waived.
I hope this information is helpful to you.  It is our hope that you assist your family in moving out of
this unsafe building and start the process of making the structure safe as soon as possible.
If you have any questions, please feel free to contact me.

Sincerely,

Keith Marks
Deputy Chief Building Official
City Of Napa

Community Development Department, City of Napa
1600 First Street, Napa, CA 94559
**Phone**  (707) 257-9540   ext 7273
**Email**  kmarks@cityofnapa.org
**Website**  www.cityofnapa.org
**Social**  www.facebook.com/CityOfNapa  ·  @CityOfNapa



**Visit our website for
up-to-date details on the drought
and ideas on how you can save water.**

**From:** Perfecto Garcia <pbg@att.net>
**Sent:** Tuesday, November 27, 2018 11:22 AM
**To:** Marks, Keith <kmarks@cityofnapa.org>; pbg1959@outlook.com; Techel, Jill

# M I N U T E S

## Napa Courts

### Civil, Criminal, Appeals

| Eldridge | C67795 |
|---|---|
| **VS.** | |
| Garcia | |

Date: 12/14/93          Time: 10:30 am          Room: F
Judge: Hon. Winton McKibben, Assigned
Event Type: Civil Petition Hearing

REPORTER:  D. Morin          CLERK:  T. Kimbrel
BAILIFF:  M. Davis

APPEARANCES:

LeRoy Eldridge, Petitioner in Pro Per.
Rudy Garcia, Sr., Respondent in Pro Per.

The parties and all witness are duly sworn to testify at this time.

The Court orders the Petitioner's request for the restraining order shall be GRANTED at this time.  The Court further orders the Restraining Order shall be MUTUAL.

-oOo-

this is a true copy of the record. If it bears the seal, imprinted in purple ink, the date of issuance and an original signature.

Dated

Jose O. Guillon, Court Executive Officer Napa County, California

By

Deputy

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name and Address)*: | TELEPHONE NO: | FOR COURT USE ONLY |
|---|---|---|
| LEROY ELDRIDGE<br>554 MONROE STREET<br>NAPA, CA 94559 | 226-3876 | |

ATTORNEY FOR *(Name)*: IN PRO PER

SUPERIOR COURT OF CALIFORNIA, COUNTY OF NAPA

STREET ADDRESS: 825 Brown Street

MAILING ADDRESS: P.O. Box 880

CITY AND ZIP CODE: Napa, California 94559-0880

BRANCH NAME:

PLAINTIFF: Leroy Eldridge

DEFENDANT: Rudy Garcia Sr.

**ENDORSED**

FILED DEC 14 1993

JANICE F. NORTON
COURT EXECUTIVE OFFICER
BY: KRISI PILKINGTON

Exp 12-14-96

| ORDER AFTER HEARING ON PETITION FOR<br>INJUNCTION PROHIBITING HARASSMENT | CASE NUMBER:<br>67795 |
|---|---|

1. THIS ORDER, EXCEPT FOR AWARD OF ATTORNEY FEES AND COSTS, SHALL EXPIRE AT MIDNIGHT ON *(date)*:

2. This proceeding came on for hearing as follows:

> Date: DECEMBER 14, 1993      Time: 8:30AM      Dept.: F      Room:

3. Judge *(name)*: Mc Kelleher      [X] Temporary judge

4. a. [X] Plaintiff present          [ ] Attorney present *(name)*:
   b. [X] Defendant present          [ ] Attorney present *(name)*:

5. After hearing on the petition, IT IS ORDERED THAT DEFENDANT *(name)*: Rudy Garcia Sr.

6. Not alarm, annoy, or harass plaintiff
   [X] and the following family and household members *(names)*: Madison Rose, Dakota Joe, Angela, Richard and Lea Eldridge
   and SPECIFICALLY IT IS ORDERED THAT DEFENDANT SHALL

   a. [X] not threaten, strike, or make physical contact with plaintiff
      [X] and the following family and household members *(names)*: Madison Rose, Dakota Joe, Angela, Richard and Lea Eldridge
   b. [X] not keep plaintiff under surveillance
      [X] and the following family and household members *(names)*: Madison Rose, Dakota Joe, Angela, Richard and Lea Eldridge
   c. [X] not follow plaintiff
      [X] and the following family and household members *(names)*: Madison Rose, Dakota Joe, Angela, Richard and Lea Eldridge
   d. [X] not telephone plaintiff
      [X] and the following family and household members *(names)*: Madison Rose, Dakota Joe, Angela, Richard and Lea Eldridge
   e. [X] not block plaintiff's movements in public places or thoroughfares
      [X] and the following family and household members *(names)*: Madison Rose, Dakota Joe, Angela, Richard and Lea Eldridge

**VIOLATION OF THIS ORDER IS A MISDEMEANOR, PUNISHABLE BY A $1000 FINE, SIX MONTHS IN JAIL, OR BOTH. THIS ORDER SHALL BE ENFORCED BY ALL LAW ENFORCEMENT OFFICERS IN THE STATE OF CALIFORNIA.**

(Continued on reverse)

ORDER AFTER HEARING ON PETITION FOR          CCP 527.6

| PLAINTIFF (Name): Leroy Eldridge | CASE NUMBER: 67795 |
|---|---|
| DEFENDANT (Name): Rudy Garcia Sr. | |

7. a. [X] Stay at least (specify): 25 yards away from the following persons and places:
(The addresses of these places are optional and may be kept confidential.)

(1) Plaintiff
[X] and the following family and household members (names): Madison Rose, Dakota Joe, Angela, Richard and Lea Eldridge

(2) [X] Plaintiff's residence (address optional): 554 Monroe St.
Napa, CA 94559

(3) [ ] Plaintiff's place of work (address optional):

(4) [ ] Plaintiff's children's school or place of child care (address optional):

(5) [X] Other (specify): Plaintiff's grandchildren's school or place of
(address optional): Child care

b. [ ] Contacts relating to pick up and delivery of children pursuant to a court order or a stipulation of the parties arrived at during mediation shall be permitted.

8. [ ] OTHER ORDERS (specify):

9. By the close of business on the date of this order, a copy of this order and any proof of service shall be given to the law enforcement agencies listed below as follows:

a. [ ] plaintiff shall deliver.
b. [ ] plaintiff's attorney shall deliver.
c. [ ] the clerk of the court shall mail.

| Law enforcement agency | Address |
|---|---|
| Napa Police Dept. | 1539 First St., Napa, CA 94558 |
| Napa County Sheriff's Dept. | 1125 Third St., Napa, CA 94558 |

**THIS ORDER IS EFFECTIVE WHEN MADE. THE LAW ENFORCEMENT AGENCY SHALL ENFORCE THE ORDER IMMEDIATELY UPON RECEIPT. IT IS ENFORCEABLE ANYWHERE IN CALIFORNIA BY ANY LAW ENFORCEMENT AGENCY THAT HAS RECEIVED THE ORDER OR IS SHOWN A COPY OF THE ORDER. IF PROOF OF SERVICE ON THE RESTRAINED PERSON HAS NOT BEEN RECEIVED, THE LAW ENFORCEMENT AGENCY SHALL ADVISE THE RESTRAINED PERSON OF THE TERMS OF THE ORDER AND THEN SHALL ENFORCE IT.**

Date: 12/14/93

JUDGE OF THE SUPERIOR COURT

## CLERK'S CERTIFICATE OF MAILING

I certify that I am not a party to this cause and that a copy of the foregoing was mailed first class, postage prepaid, in a sealed envelope addressed as shown in item 9, and that the mailing of the foregoing and execution of this certificate occurred at (place): NAPA , California,

on (date): JANICE F. NORTON Clerk, by _____ , Deputy